UNITED STATES of America, Plaintiff-Appellee,

v.

Jose DUARTE-ACERO, Defendant-Appellant.

No. 98-5756.

United States Court of Appeals,

Eleventh Circuit.

April 13, 2000.

Appeal from the United States District Court for the Southern District of Florida. (No. 82-00292-CR-JAG), Jose A. Gonzalez, Jr., Judge.

Before TJOFLAT, Circuit Judge, FAY, Senior Circuit Judge, and HANCOCK[*], Senior District Judge.

TJOFLAT, Circuit Judge:

This is an interlocutory appeal of a district court decision denying appellant's motion to dismiss an indictment on double jeopardy grounds. *See United States v. Benitez,* 28 F.Supp.2d 1361 (S.D.Fla.1998). The offenses alleged in the indictment took place in Colombia, South America, and arose out of a conspiracy to murder two special agents of the Drug Enforcement Agency ("DEA"). Appellant alleges, and the Government all but concedes, that he was convicted in Colombia of the same conduct alleged in the instant indictment. Appellant argues that the double jeopardy provision of the International Covenant on Civil and Political Rights (the "ICCPR")[1] bars his prosecution in the district court.[2] We agree with the district court

[*]Honorable James H. Hancock, Senior U.S. District Judge for the Northern District of Alabama sitting by designation.

[1]International Covenant on Civil and Political Rights, *opened for signature* Dec. 16, 1966, 999 U.N.T.S. 171, 6 I.L.M. 368 (1967) (entered into force Mar. 23, 1976); *see also* 138 Cong. Rec. S4783-84 (daily ed. Apr. 2, 1992); 31 I.L.M. 645, 651-60 (1992) (setting out the text of the reservations, understandings, and declarations that relate to the obligations of the United States under the ICCPR). Currently, 144 nations are parties to the ICCPR, including Colombia and the United States. Colombia ratified the ICCPR on October 29, 1969, while, in the United States, it entered into force on September 8, 1992.

[2]At the time the instant indictment was returned, appellant was in Colombia. The Government requested his extradition, but the Colombia courts denied its request, apparently citing the *non bis in idem* clause of the extradition treaty then in effect between the United States and Colombia. That clause precluded extradition if the "offense" for which the United States intended to prosecute the person (present in Colombia) had already been prosecuted in Colombia. In his motion to dismiss the instant indictment, appellant cited the

that this provision constitutes no bar to appellant's prosecution in the Southern District of Florida and therefore affirm.

## I.

The indictment in this case charges appellant and three others (Rene Benitez, Armando Benitez, and Jairo David Valencia) with five offenses,[3] all occurring on February 10, 1982, in Cartagena, Colombia. On that day, the four men abducted two DEA agents (who were investigating drug trafficking between Colombia and the United States) from their hotel room and, after leaving the city, shot the agents and left them for dead.[4] The agents survived the shooting and returned to the United States.

On August 28, 1997, DEA agents, using a ruse, lured appellant across the Colombian border into Quito, Equador, and arrested him.[5] The next day, appellant appeared before the district court in the Southern District of Florida and entered a not guilty plea. On April 28, 1998, appellant moved the court to dismiss the indictment. He argued that because he had been convicted in Colombia for the conduct alleged in the indictment, the double jeopardy provision of the ICCPR barred his prosecution. That provision, Article 14(7),

---

policy underlying the *non bis in idem* clause as an additional ground for relief. The district court found the policy inapplicable. *See Benitez,* 28 F.Supp.2d at 1364-65. In his appellate brief, appellant relied on that policy, arguing that the doctrines of international "comity" and "abstention" precluded the instant prosecution. Appellant cites no authority for this argument. We find none, and therefore reject it without further comment.

[3]The indictment charged all four men with one count of conspiring to murder DEA agents engaged in the performance of their official duties, in violation of 18 U.S.C. §§ 1114 & 1117 (1994); two counts of assaulting DEA agents with deadly weapons while they were performing official duties, in violation of 18 U.S.C. §§ 111 & 2 (1994); and two counts of robbing DEA agents of personal property belonging to the United States (official United States government passport and DEA credentials), in violation of 18 U.S.C. §§ 2112 & 2 (1994).

[4]The details of the crime alleged in the instant indictment are set out in an opinion of this court affirming the conviction, after trial, of one of appellant's co-conspirators. *See United States v. Benitez,* 741 F.2d 1312, 1313-15 (11th Cir.1984).

[5]Appellant does not challenge the district court's jurisdiction to try him for the offenses charged in the instant indictment. In fact, one of his co-conspirators, Armando Benitez, brought such a challenge to this court and we rejected it. *See Benitez,* 741 F.2d at 1316-17.

states that "[n]o one shall be liable to be tried or punished again for an offence[6] for which he has already been finally convicted or acquitted in accordance with the law and penal procedure of each country." The district court denied appellant's motion, holding that the ICCPR's double jeopardy provision precluded appellant's reprosecution in Colombia but did not bar his prosecution in the United States. *See Benitez,* 28 F.Supp.2d at 1363-64.[7]

## II.

We have jurisdiction under section 28 U.S.C. § 1291 (1994) to entertain appeals of final judgments; the denial of a pretrial motion to dismiss on double jeopardy grounds is considered a final judgment even though it "lacks the finality traditionally considered indispensable to appellate review." *Abney v. United States,* 431 U.S. 651, 659, 97 S.Ct. 2034, 2040, 52 L.Ed.2d 651 (1977); *United States v. Carter,* 60 F.3d 1532, 1534 (11th Cir.1995). We review *de novo* a district court's decision to deny a motion to dismiss based on double jeopardy grounds because it presents a pure question of law. *See United States v. Baptista-Rodriguez,* 17 F.3d 1354, 1360 (11th Cir.1994).

## III.

### A.

Article 2(1) of the ICCPR provides that a state that becomes party to the treaty "undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the

---

[6]British spelling is used in the original. We retain this spelling when referring to the original text.

[7]The court assumed that appellant had been convicted in Colombia as alleged in his motion to dismiss. The court did so after appellant's counsel represented that he could provide the court with documental proof of his conviction (appellant contends that he was prosecuted in Colombia on charges of attempted murder and impersonating an officer and that, following his conviction, he was incarcerated in Colombia for forty months and ten days, followed by four years of supervised release). The Government did not contest this representation; however, it did question whether the Colombian adjudication was for the same offenses alleged in the instant indictment for the purpose of applying the double jeopardy rule of *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932) ("[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not."). That rule has no application in this case.

present Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status." Among those rights a state "undertakes to respect and ensure" are the right to life, *see* art. 6; freedom from torture, *see* art. 7; the right to a fair trial, *see* art. 14; freedom of opinion and expression, *see* art. 19; and freedom of association, *see* art. 22.[8] On September 8, 1992, the United States, following the advice and consent of the Senate,[9] became a party to the ICCPR, at which time the treaty became, coexistent with the United States Constitution and federal statutes, the supreme law of the land.[10]

As noted, appellant claims that Article 14(7) of the ICCPR bars his prosecution on the instant indictment. Article 14(7) provides that, "[n]o one shall be liable to be tried or punished again for an offence for which he has already been finally convicted or acquitted in accordance with the law and penal procedure of each country." Appellant contends, in his brief, that Article 14(7) creates an international double jeopardy bar that "is broader than modern constructions of the [U.S.] Constitution's Double Jeopardy Clause" and that "[t]he obligations under the ICCPR run not only between all State parties to the agreement but they also run between a State party and any individual within that State."[11] Albeit a matter of first impression, appellant's argument can be dismissed rather easily; it is clearly contradicted by the language of the ICCPR as well as

---

[8]The Senate gave its consent to the ICCPR subject to the following declaration: "That the United States declares that the provisions of Article 1 through 27 of the Covenant are not self-executing." 138 Cong. Rec. S4781, S4783 (daily ed. Apr. 2, 1992); 31 I.L.M. 645, 659 (1992); *see also United States v. Postal,* 589 F.2d 862, 875-76 (5th Cir.1979) (explaining that treaties that are not self-executing require implementing legislation before individuals can rely on their provisions in U.S. courts).

[9]"[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur...." U.S. Const. art. II, § 2, cl. 2.

[10]"[A]ll Treaties made ... under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

[11]At the hearing on his motion to dismiss, appellant accused the Government of "domestic tunnel vision" and argued that the ICCPR is a code of human rights for those living in a "brave new world," "a global village [where] certain rights are now universally guaranteed for each individual no matter where they live and no matter where they go in the world."

4

Article 14(7)'s legislative history and the United Nations Human Rights Committee's (the "HRC")[12] interpretation of this provision.

B.

Naturally, our first focus in interpreting the ICCPR is its plain language. *See Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 534, 111 S.Ct. 1489, 1493, 113 L.Ed.2d 569 (1991) ("When interpreting a treaty, we 'begin with the text of the treaty and the context in which the written words are used.' ") (quoting *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 699, 108 S.Ct. 2104, 2108, 100 L.Ed.2d 722 (1988)). If the language of the treaty is clear and unambiguous, as with any exercise in statutory construction, our analysis ends there, and we apply the words of the treaty, as written. *See Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 135, 109 S.Ct. 1676, 1684, 104 L.Ed.2d 113 (1989) ("[T]o alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be on our part an usurpation of power, and not an exercise of judicial functions. It would be to make, and not to construe a treaty.") (quoting *In re The Amiable Isabella,* 19 U.S. (6 Wheat.) 1, 71, 5 L.Ed. 191 (1821)).

Finally, although treaties are to be liberally construed, *Air France v. Saks,* 470 U.S. 392, 396, 105 S.Ct. 1338, 1341, 84 L.Ed.2d 289 (1985),

> [t]his does not mean ... that treaty provisions are construed broadly. Rather, this "liberal" approach to treaty interpretation merely reflects ... the willingness of courts, when interpreting difficult or ambiguous treaty provisions, to "look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties."

*Kreimerman v. Casa Veerkamp, S.A. de C.V.,* 22 F.3d 634, 638-39 (5th Cir.1994) (quoting *Eastern Airlines, Inc.,* 499 U.S. at 535, 111 S.Ct. at 1493, 113 L.Ed.2d 569 (citations omitted)); *see also Washington v.*

---

[12]The HRC was established in 1977 in accordance with Article 28 of the ICCPR. The HRC is charged with implementing and interpreting the ICCPR as well as monitoring its compliance. *See* arts. 28-45. It fulfills this task by having state parties submit reports concerning their compliance efforts, *see* art. 40; by considering complaints ("communications") by one state party alleging a violation of the ICCPR by another state party, *see* art. 41; and for those state parties which have ratified the First Optional Protocol, the HRC has jurisdiction to hear complaints from individuals against their own state, *see* Optional Protocol to the International Covenant on Civil and Political Rights, *opened for signature,* Dec. 16, 1966, 999 U.N.T.S. 302, 6 I.L.M. 383 (1967) (entered into force Mar. 23, 1976). The HRC responds to these communications with published findings called "views." The United States has not ratified the First Optional Protocol.

5

*Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 675, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 (1979) ("[I]t is the intention of the parties ... that must control any attempt to interpret [a] treat[y].").

C.

The clear language of the ICCPR manifests that its provisions are to govern the relationship between an individual and his state, and, not as appellant argues, the relationship between sovereigns. In other words, the ICCPR is concerned with conduct that takes places within a state party; its provisions do "not purport to regulate affairs between nations." *Benitez,* 28 F.Supp.2d at 1363. Reminders of this framework are replete within the ICCPR. For instance, Article 2(1), quoted above, provides that the obligations of the state under the treaty extend to "all individuals within its territory and subject to its jurisdiction." Further examples of the intra-national character and jurisdictional limitations of the ICCPR's guarantees are found in Article 12 ("Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement ..."); Article 13 ("Any alien lawfully in the territory of a State Party to the present Covenant may be expelled therefrom only in pursuance of a decision reached in accordance with law ..."); Article 23(1) ("The family is the natural and fundamental group unit of society and is entitled to protection by society and the State."); Article 27 ("In those States in which ethnic, religious or linguistic minorities exist ..."); and Article 50 ("The provisions of the present Covenant shall extend to all parts of federal States without any limitations or exceptions.").

With respect to Article 14(7), in particular, the clear language itself circumscribes the reach of the double jeopardy provision. First, the provision bars a successive prosecution only when the second criminal proceeding is for the same "offence." A broader formulation would have used the word "act," "action," or "conduct." *See* Marc J. Bossuyt, *Guide to the "Travaux Preparatoires" of the International Covenant on Civil and Political Rights* 316 (1987) (hereinafter Bossuyt) (noting that the drafters of Article 14(7) specifically chose the word "offence" rather than "action" although "[s]ome representatives would have preferred the

6

adoption of a wider formula prohibiting successive trials, not only for the same 'offence,' but also for the same 'actions' ").[13] The bar to re-prosecution for the "same offense" is a concept with which jurists in this country are intimately familiar. *See Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182, 76 L.Ed. 306.

Second, the bar against successive prosecutions in Article 14(7) is only for those individuals who have "already been finally convicted or acquitted *in accordance with the law and penal procedure of each country.*" art. 14(7) (emphasis added). Thus, a successive prosecution is barred only when the accused is tried under the same law and criminal procedure. Intuitively, this would only happen when the second prosecution takes place in the same country. Clearly, then, a state party could try an individual under its law even though the individual has already been prosecuted for the same conduct under another party state's criminal code. *See* Bossuyt, *supra,* at 316 (noting that the delegates recognized that Article 14(7), as written, allowed a "State ... to try, in accordance with its laws, persons already sentenced for the same offence by the courts of another country."). In sum, country X faithfully complies with its obligation under the ICCPR even when it prosecutes an individual previously convicted or acquitted in country Y if the conduct that is the subject of the prosecution in X constitutes an "offence" under the laws of country X.[14]

---

[13]Similarly, Protocol 7 of the European Convention on Human Rights provides, "[n]o one shall be liable to be tried or punished again in criminal proceedings under the jurisdiction of the same State for an offence for which he has already been finally acquitted or convicted in accordance with the law and penal procedure of that State." Protocol No. 7 to the European Convention for the Protection of Human Rights and Fundamental Freedoms, art. 4, Nov. 22, 1984, Europ. T.S. No. 117, 24 I.L.M. 435 (1985); *see also Buzunis v. Greece,* App. No. 22997/93 (Dec. 2, 1994) (Commission report), *available in* HUDOC, (visited Mar. 21, 2000) <http://www.dhcour.coe.fr/hudoc/> (stating that "neither the [European Convention on Human Rights] nor any of the additional Protocols does, either expressly or implicitly, guarantee the principle of *n[on] bis in idem* in respect of convictions in different States.").

[14]In sharp contrast to the language of Article 14(7), the statute the International Law Commission drafted for the creation of an international criminal court "ma[de] a deliberate departure from the long-standing notion that sovereign nations are not required to give legal effect to each other's penal judgments." Lara A. Ballard, Note, *The Recognition and Enforcement of International Criminal Court Judgments in U.S. Courts,* 29 Colum. Hum. Rts. L.Rev. 143, 172 (1997) (hereinafter Ballard). Article 42 of the draft provided, "[n]o person shall be tried before any other court for acts constituting a crime ... for which that person has already been tried by the Court." *Draft Statute For An International Criminal Court, Report Of The International Law Commission On The Work Of Its Forty-Sixth Session,* art. 42, U.N. GAOR, 49th Sess., Supp. No. 10, at 43-161, U.N. Doc. A/49/10 (1994). The official commentary to Article 42 acknowledged that this language was necessary in order to offer "a greater degree of protection against double jeopardy" than "Article 14(7)

7

Finally, and "[m]ost importantly perhaps," *Benitez,* 28 F.Supp.2d at 1364, the HRC, the body charged under the ICCPR with monitoring its implementation, has spoken on this issue and has endorsed the view that "article 14, paragraph 7 ... does not guarantee *non bis in idem* with regard to the national jurisdictions of two or more States."[15] In *A.P. v. Italy,* an Italian citizen filed a communication with the HRC claiming that the Italian government, in violation of Article 14(7), punished him for an offense for which he had already been tried and convicted in Switzerland. Italy claimed that there was no violation of the ICCPR's double jeopardy provision since this provision did not protect the principle of international *non bis in idem.* Italy further argued that Article 14(7) "must be understood as referring exclusively to the relationships between judicial decisions of a single State and not between those of different States." *Id.* at para. 5.3. The HRC agreed with Italy and concluded that Article 14(7) "prohibits double jeopardy only with regard to an offence adjudicated within a given State." *Id.* at para. 7.3. Appellant fails to explain why we should depart from the HRC's

---

[of the ICCPR, which] has been interpreted as limited to trials within a single jurisdiction." *Id*. at cmt. 2. The final version of the International Criminal Court statute, adopted by the United Nations Diplomatic Conference on Plenipotentiaries on the Establishment of an International Criminal Court, reads, "[n]o person shall be tried by another court for a crime ... for which that person has already been convicted or acquitted by the Court." *Rome Statute on the International Criminal Court,* art. 20(2), *opened for signature July 17, 1998,* U.N. Doc. A/CONF.183/9 (1998) (not yet in force), 37 I.L.M. 999 (1998).

> In addition, Ballard observed the following:
>
> The general rule of international law is that, in the absence of a treaty, sovereign states are not obligated to enforce each other's penal judgments.... This means that if an act constitutes an offense within a state's jurisdiction, the state has a right to prosecute the act regardless of whether other states might already have done so. Article 14(7) of the [ICCPR] preserves this important limitation on international double jeopardy protection, specifying that "no one shall be liable to be tried or punished again for an offence for which he has already been finally convicted or acquitted in accordance with the law and penal procedure of each country." Other international documents, as well as the Fifth Amendment of the U.S. Constitution, also recognize this caveat. This rule is not only recognized by the U.S. Supreme Court, but is also reflected within the U.S. federalist structure as the "dual sovereignty" doctrine.

Ballard, *supra,* at 173-74 (footnotes and citations omitted).

[15]*A.P. v. Italy,* (view adopted Nov. 2, 1987 at 31st Sess.) Communication No. 204/1986, at para. 7.3, Report of the Hum. Rts. Comm., 43rd Sess., Supp. No. 40, at 242, U.N. Doc. A/43/40 (1988) (attached to this opinion as an appendix).

revealing "view." *Cf. Knight v. Florida,* --- U.S. ----, 120 S.Ct. 459, 464, 145 L.Ed.2d 370 (1999) (Breyer, J., dissenting in denial of certiorari) (citing a view of the HRC and finding it helpful even though it was not binding); *Maria v. McElroy,* 68 F.Supp.2d 206, 232 (E.D.N.Y.1999) ("The Human Rights Committee's General Comments and decisions in individual cases are recognized as a major source for interpretation of the ICCPR.").

IV.

For the forgoing reasons, we conclude that Article 14(7) of the ICCPR cannot be invoked defensively to avoid a prosecution in the courts of the United States despite an earlier prosecution for the same offense in the courts of another state party.

AFFIRMED.

[APPENDIX]

A.P. v. ITALY

Communication No. 204/1986

Decision adopted on 2 November 1987

at the thirty-first session[1]

*Submitted by:* A.P. [name deleted]

*Alleged victim* : The author

*State party concerned:* Italy

*Date of communication:* 16 January 1986 (date of initial letter)

*The Human Rights Committee,* established under article 28 of the International Covenant on Civil and Political Rights,

*Meeting* on 2 November 1987,

*Adopts* the following:

---

[1] Pursuant to rule 85 of the provisional rules of procedure, Committee member Fausto Pocar did not take part in the adoption of the decision.

9

*Decision on admissibility*

1. The author of the communication (initial letter dated 16 January 1986 and a further letter of 7 September 1987) is A. P., an APPENDIX-continued
Italian citizen born on 12 March 1940 in Tunisia, at present residing in France.  He claims to be the victim of a violation of article 14, paragraph 7, of the Covenant by the Italian Government.  He is represented by counsel.

2.1. The author states that he was convicted on 27 September 1979 by the Criminal Court of Lugano, Switzerland, for complicity in the crime of conspiring to exchange currency notes amounting to the sum of 297,650,000 lire, which was the ransom paid for the release of a person who had been kidnapped in Italy in 1978.  He was sentenced to two years' imprisonment, which he duly served.  He was subsequently expelled from Switzerland.

2.2. It is claimed that the Italian Government, in violation of the principle of *non bis in idem,* is now seeking to punish the author for the same offence as that for which he had already been convicted in Switzerland.  He was thus indicted by an Italian court in 1981 (after which he apparently left Italy for France) and on 7 March 1983 the Milan Court of Appeal convicted him *in absentia.* On 11 January 1985, the Second Division of the Court of Cassation in Rome upheld the conviction and sentenced him to four years' imprisonment and a fine of 2 million lire.

2.3. The author invokes article 14, paragraph 7, of the Covenant, which provides:

"No one shall be liable to be tried or punished again for an offence for which he has already been finally convicted or acquitted in accordance with the law and penal procedure of each country."

He further rejects the Italian Government's interpretation of this provision as being applicable only with regard to judicial decisions of the same State and not with regard to decisions of different States.

APPENDIX-continued

2.4. The author further indicates that in 1984 the Italian Government addressed an extradition request to the Government of France, but that the Paris Court of Appeal, by judgement of 13 November 1985, denied

extradition because it would violate French *ordre public* to make the author suffer two terms of imprisonment based on the same facts.

3. The Committee has ascertained that the same matter has not been submitted to another procedure of international investigation or settlement.

4. By its decision of 19 March 1986, the Working Group of the Human Rights Committee transmitted the communication under rule 91 of the provisional rules of procedure to the State party concerned, requesting information and observations relevant to the question of the admissibility of the communication, in particular details of the effective remedies available to the author in the particular circumstances of his case. It also requested the State party to provide the Committee with the text of any court orders or decisions of relevance to the case, including the 1981 indictment of the author, the judgement of 7 March 1983 of the Milan Court of Appeal and the judgement of 11 January 1985 of the Court of Cassation in Rome.

5.1. In its submission under rule 91, dated 24 June 1987, the State party provides copies of the court orders and decisions in the author's case and objects to the admissibility of the communication, which it considers unfounded (*sans fondement* ). In particular, the State party argues that Mr. P. was tried for two different offences in Switzerland and in Italy.

5.2. The State party first provides an outline of the factual situation:

APPENDIX-continued

"A few months after the kidnapping of M.G. M., in Milan on 25 May 1978, and the payment by her family of 1,350 million lire, attempts were made to 'launder' sums deriving from the crime. In particular, on 4 September 1978, a person later identified as J.M.F. attempted to convert into a bank cheque the sum of 4,735,000 lire at the Milan branch of the Banca Nazionale del Lavoro; on 6 September 1978, the same individual negotiated the sum of 120 million lire at several banks in Lugano (Switzerland); on 12 September 1978, again at different banks in Lugano, J.M. F., this time accompanied by the author changed 100 million lire into Swiss francs. On that occasion, the Swiss police intervened and J.M.F. absconded, while A.P. was arrested. Some time later, a further sum of 57,650,000 lire was found hidden in a rented car that had been used by J.M.F. and A.P. to travel to Switzerland."

5.3. The State party then rejects the author's contention that article 14, paragraph 7, of the Covenant protects the principle of "international *non bis in idem* ". In the opinion of the State party, article 14, paragraph 7,

11

must be understood as referring exclusively to the relationships between judicial decisions of a single State and not between those of different States.

6. In his comments, dated 7 September 1987, the author contends that his allegations with respect to a violation of article 14, paragraph 7, are well founded and argues that article 14, paragraph 7, of the Covenant should be interpreted broadly, so as to apply to judicial decisions of different States.

7.1. Before considering any claims contained in a communication, the Human Rights Committee shall, in accordance with rule 87 of its provisional rules of procedure, APPENDIX-continued

decide whether or not it is admissible under the Optional Protocol to the Covenant.

7.2. The Committee notes that the State party does not claim that the communication is inadmissible under article 5, paragraph 2, of the Optional Protocol. With regard to article 5, paragraph 2(a), the Committee observes that the matter complained of by A.P. has not been submitted to another procedure of international investigation or settlement. With regard to article 5, paragraph 2(b), the State party has not claimed that there are domestic remedies which the author could still pursue in his case.

7.3. With regard to the admissibility of the communication under article 3 of the Optional Protocol, the Committee has examined the State party's objection that the communication is incompatible with the provisions of the Covenant, since article 14, paragraph 7, of the Covenant, which the author invokes, does not guarantee *non bis in idem* with regard to the national jurisdictions of two or more States. The Committee observes that this provision prohibits double jeopardy only with regard to an offence adjudicated in a given State.

8. In the light of the above, the Human Rights Committee concludes that the communication is incompatible with the provisions of the Covenant and thus inadmissible *ratione materiae* under article 3 of the Optional Protocol.

9. The Human Rights Committee therefore decides:

(a) That the communication is inadmissible;

(b) That this decision shall be communicated to the State party and the author of the communication.