[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 12, 2002
THOMAS K. KAHN

_____

No. 01-13457

_____

D. C. Docket No. 82-00292 CR-JAG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE IVAN DUARTE-ACERO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 12, 2002)**

Before TJOFLAT, COX and MAGILL*, Circuit Judges.

COX, Circuit Judge:

_____

*Honorable Frank J. Magill, U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

Jose Ivan Duarte-Acero, a Colombian citizen, was indicted in 1982 for conspiring to murder two Drug Enforcement Administration ("DEA") agents engaged in the performance of their official duties and for related offenses. In 1997, Duarte was finally apprehended in Ecuador and brought to the Southern District of Florida for trial. He was tried, convicted, and sentenced to life. On appeal, he seeks both the dismissal of his indictment and the vacation of his sentence. Duarte asserts that his indictment should be dismissed because the circumstances of his arrest violated both the Vienna Convention on Consular Relations and the International Covenant on Civil and Political Rights. Regarding his sentence, Duarte contends that it violates *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000) because the indictment failed to charge, and the jury failed to find, that his attempted murder was either premeditated or malicious. We affirm Duarte's conviction and sentence.

## I. BACKGROUND

### A. FACTS

#### 1. The Crime

The facts of the crime are set out more fully in *United States v. Benitez*, 741 F.2d 1312, 1313-15 (11th Cir. 1994). On February 10, 1982, Duarte, along with Rene Benitez, Armando Benitez, and Jairo David Valencia, kidnapped two DEA agents, Charles Martinez and Kelly McCullough, from their hotel room in Cartagena,

2

Colombia. Duarte, a retired lieutenant of the Colombian *Policia Nacional*, used his expired *Policia Nacional* identification to gain access to Martinez's room at the Don Blas Hotel.

After an interrogation and a search of their room, Martinez and McCullough were forced into a car that Duarte drove out of the city. During the drive, the agents told the kidnappers that they were investigating drug trafficking. Upon hearing this, Rene Benitez shot Martinez.

Eventually, Duarte stopped the car near a wooded area. The agents, fearing for their lives, began to struggle with the kidnappers. During the struggle, McCullough attempted to grab Duarte's gun, but he failed and instead attempted to run away. Duarte fired three shots at McCullough and missed. The next shot hit McCullough in the leg and another shot hit McCullough in the hip. McCullough fell to the ground.

Duarte walked to where McCullough was laying and stood over him. Duarte fired one shot into McCullough's neck. McCullough pretended to be dead while he waited for Duarte to fire another shot. The shot never came. Eventually, McCullough found his way back to Cartagena and, later, to the United States.

On May 20, 1982, acting on information provided by the DEA, the Venezuelan *Policía Técnica Judicial* arrested Duarte in San Cristobal, Venezuela. Duarte was escorted to the Venezuelan border and released into the custody of the Colombian

3

*Policia Nacional* in Cucuta, Colombia. Duarte was flown to Bogota, Colombia and booked for the kidnapping and attempted murder of the two DEA agents. He was tried and convicted for his crimes in Cartagena's criminal court, and he was sentenced to forty months and ten days in prison and four years of supervised release.

The United States attempted to extradite Duarte in accordance with its extradition treaty with Colombia.[1] On May 30, 1983, the *Corte Suprema de Justical*, Colombia's highest court, denied the request to extradite Duarte. According to the court, Duarte's extradition would have violated both the Colombia Penal Code and the double-jeopardy clause in the extradition treaty. Furthermore, the court found that all of the acts and events had occurred in Colombian territory. In 1987, the *Corte Suprema de Justical* annulled the extradition treaty altogether, finding its ratification unconstitutional.[2]

Duarte was released from prison on December 12, 1984. In early 1987, the DEA, with the cooperation of Venezuelan law enforcement authorities, attempted to ensnare Duarte in Venezuela. This effort failed, though Duarte was arrested and

---

[1]*See* Extradition Treaty with the Republic of Colombia, Sept. 14, 1979, U.S.-Colom., S. Treaty Doc. No.97-8 (entered into force Mar. 4, 1982).

[2]*See generally* Igor I. Kavass, *Colombia: Supreme Court Decision on Law Concerning the Extradition Treaty Between Colombia and the United States*, 27 Int'l Legal Materials 492 (1988).

imprisoned in Venezuela on cocaine charges. Ultimately, Duarte was returned to Colombia. He then became the owner of Chivera, a car-parts business and junkyard in Cucuta.

### 2. The Arrest

For several years, Duarte operated his business and lived openly under his own name. Then, in August 1997, a company called Acosta Acosta asked Duarte to be the manager of their new Cucuta office. Acosta Acosta sent an airplane ticket to Duarte, and he flew to Bogota. At the Eldorado Airport in Bogota, Duarte was greeted by Juan and Marta Acosta, who invited him to dinner. The next morning, Juan Acosta contacted Duarte at his hotel. Acosta desperately needed Duarte's help in transporting a truckload of computers from Ecuador to Colombia.

Unbeknownst to Duarte, the Acostas were actually undercover agents. Duarte arrived in Ipiales, on the border of Colombia and Ecuador, and crossed into Tulcan, Ecuador, on foot via the international bridge of Rumichaca. He was immediately apprehended by the Ecuadorian *Policia Nacional* and the DEA. When he heard why he was being arrested, Duarte said that he had already served time for his crime. He also asked to speak to the Colombian Consulate. Duarte's requests were ignored.

Duarte was excluded from Ecuador, without a hearing, and placed on a DEA plane. Prior to embarking, Duarte was read his *Miranda*[3] rights. While en route to Fort Lauderdale, Duarte told the DEA agents that he was sorry for what he had done and that he was glad the agents were not dead. He also said that he did not know that the men were agents when he shot them but that he had participated in the crime as a favor to Rene Benitez, his drinking buddy.

## B. PROCEDURAL HISTORY

On June 11, 1982, Duarte was indicted along with Rene Benitez, Armando Benitez, and Jairo David Valencia Cardenas. The indictment includes five counts. Count I charges all defendants with conspiring to kill Martinez and McCullough while engaged in, and on account of, their duties as DEA agents, in violation of 18 U.S.C. § 1117. Counts II and III charge all defendants with using dangerous weapons to assault, resist, and impede Martinez and McCullough in the performance of their duties, in violation of 18 U.S.C. § 111. Counts IV and V charge all defendants with robbing Martinez and McCullough of their DEA credentials and their passports, in violation of 18 U.S.C. § 2112.

Duarte was arraigned in Fort Lauderdale on August 29, 1997. He pleaded not guilty. Duarte also filed a motion to dismiss the indictment, arguing that the double-

_____

[3]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

6

jeopardy provision of the International Covenant on Civil and Political Rights and the international principle of *non bis in idem*[4] bar a second prosecution for his crime. The district court denied the motion to dismiss, *United States v. Benitez*, 28 F. Supp. 2d 1361 (S.D. Fla. 1998), and we affirmed on interlocutory appeal, *United States v. Duarte-Acero*, 208 F.3d 1282 (11th Cir. 2000).

Duarte filed a second motion to dismiss, arguing that the indictment should be dismissed because he was denied certain rights guaranteed by the Vienna Convention on Consular Relations and the International Covenant on Civil and Political Rights. The district court also denied this motion to dismiss. *United States v. Duarte Acero*, 132 F. Supp. 2d 1036 (S.D. Fla. 2001).

Duarte was tried and convicted on all counts of the indictment. Since Duarte committed his crime prior to the enactment of the Sentencing Guidelines, he was subject to the statutory maximum for each offense. On Count I, Duarte was sentenced to life in prison. He was sentenced to ten years each on Counts II and III and fifteen years each on Counts IV and V. The sentences for Counts II through V were to run concurrently with each other and consecutively to the sentence on Count I.

## II.  ISSUES ON APPEAL

---

[4]"Not twice for the same thing."  Black's Law Dictionary 1665 (7th ed. 1999).

Duarte raises several issues on appeal: (1) Whether the district court erred by failing to dismiss his indictment because he was denied the right to speak to his consulate as guaranteed by Article 36 of the Vienna Convention on Consular Relations; (2) Whether the district court erred by failing to dismiss his indictment because he was denied certain rights guaranteed by Articles 9, 12(4), 13, and 14 of the International Covenant on Civil and Political Rights; and (3) Whether the district court erred by sentencing Duarte for conspiracy to murder because the jury was not instructed regarding premeditation or malice.[5]

## III.  STANDARDS OF REVIEW

We review the district court's denial of a motion to dismiss an indictment for abuse of discretion. *United States v. Pielago*, 135 F.3d 703, 707 (11th Cir. 1998). We review a pre-Guidelines sentence for an abuse of discretion. *United States v. Hurtado-Gonzalez*, 74 F.3d 1147, 1149 (11th Cir. 1996).

## IV.  DISCUSSION

---

[5]Duarte also raises three other issues: (1) Whether the delay between Duarte's crime and his trial violated his Sixth Amendment right to a speedy trial; (2) Whether the district court abused its discretion by excluding a videotape of Duarte's arrest; and (3) Whether the district court erred by failing to dismiss the indictment because it violated the double-jeopardy provision in Article 14(7) of the International Covenant on Civil and Political Rights.  The first two issues are without merit, and we affirm without discussion.  *See* 11th Cir. R. 36-1.  The third issue was resolved in *United States v. Duarte-Acero*, 208 F.3d 1282, 1288 (11th Cir. 2000).

## A. THE VIENNA CONVENTION ON CONSULAR RELATIONS

The Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 (ratified Nov. 24, 1969) (hereinafter "Vienna Convention"), is a 79-article, multilateral treaty written in 1963 and ratified by the United States in 1969. Article 36 provides, in pertinent part, that, "if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner." Duarte contends that, under the rules of the Convention, Ecuadorian authorities should have immediately informed the Colombian consulate of Duarte's arrest once Duarte asked them to do so.

It is undisputed that Duarte requested, several times, that the Colombian consulate be informed of his arrest. It is also undisputed that Duarte's request was ignored. Duarte contends that, because the Ecuadorian authorities, in cooperation with the DEA, failed to comply with the Convention, the indictment against him should have been dismissed.

In *United States v. Cordoba-Mosquera*, 212 F.3d 1194 (11th Cir. 2000), we followed the lead of other circuits by stating that neither the suppression of evidence nor the dismissal of an indictment is an appropriate remedy for a violation of Article

9

36. *Id.* at 1196. However, we also indicated that the defendant's failure to show prejudice influenced, to some degree, our decision in that case. *See id.* Duarte contends that he suffered prejudice from the Article 36 violation because, had his rights been acknowledged and protected, he would have been returned to Colombia, not sent to the United States. Since he suffered prejudice, Duarte argues, *Cordoba-Mosquera* is inapplicable to him.

We need not decide whether the absence of prejudice was central to the holding in *Cordoba-Mosquera*[6] since we conclude that the remedy Duarte seeks, dismissal of the indictment, is simply unavailable under the Vienna Convention. First, the Vienna Convention itself disclaims any intent to create individual rights, stating that its purpose "is not to benefit individuals but to ensure the efficient performance of functions by consular posts." *Preamble* to Vienna Convention, 21 U.S.T. 77, 79; *United States v. Emuegbunam*, 268 F.3d 377, 392 (6th Cir. 2001); *United States v. Jimenez-Nava*, 243 F.3d 192, 196 (5th Cir. 2001); *United States v. Li*, 206 F.3d 56, 62

---

[6]We note that other courts have not found prejudice central to the holding in *Cordoba-Mosquera*; rather, they have read *Cordoba-Mosquera* as holding that neither the suppression of evidence nor the dismissal of an indictment is an appropriate remedy for a violation of the Vienna Convention. *See United States v. De la Pava*, 268 F.3d 157, 165-66 (2d Cir. 2001); *United States v. Minjares-Alvarez*, 264 F.3d 980, 986 (10th Cir. 2001); *United States v. Page*, 232 F.3d 536, 540 (6th Cir. 2000); *United States v. Chaparro-Alcantara*, 226 F.3d 616, 622 (7th Cir. 2000); *People v. Hernandez*, 745 N.E.2d 673, 683 (Ill. App. Ct. 2001); *Garcia v. State*, 17 P.3d 994, 997 (Nev. 2001).

(1st Cir. 2000) (en banc).  Furthermore, the Convention nowhere suggests that the dismissal of an indictment is an appropriate remedy for a violation.  *See United States v. Page*, 232 F.3d 536, 540 (6th Cir. 2000); *Li*, 206 F.3d at 62.

Extra-textual sources lead us to the same conclusion.  First, the State Department has consistently stated that the only remedies for a violation of the Vienna Convention are diplomatic, political, or derived from international law.  *Emuegbunam*, 268 F.3d at 392; *Li*, 206 F.3d at 63-64; *Jimenez-Nava*, 243 F.3d at 197.  And the State Department's interpretation of a treaty is entitled to great deference.  *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 168, 119 S. Ct. 662, 671 (1999); *Emuegbunam*, 268 F.3d at 392; *United States v. De la Pava*, 268 F.3d 157,  165 (2nd Cir. 2001); *Li*, 206 F.3d at 63.  Furthermore, no party to the Vienna Convention has dismissed a criminal charge based on a violation of Article 36.  *Emuegbunam*, 268 F.3d at 393; *Page*, 232 F.3d at 541; *Li*, 206 F.3d at 65.  Indeed, two parties, Italy and Australia, have specifically rejected that possibility.  *Page*, 232 F.3d at 541; *United States v. Lombera-Camorlinga*, 206 F.3d 882, 888 (9th Cir. 2000) (en banc).  And "international agreements should be consistently interpreted among the signatories." *Jimenez-Nava*, 243 F.3d at 195.

Therefore, we join our sister circuits by holding that a violation of Article 36 of the Vienna Convention on Consular Relations does not warrant the dismissal of an

indictment. *See De la Pava*, 268 F.3d at 165; *Page*, 232 F.3d at 541; *Li*, 206 F.3d at 60.

## B. THE INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS

The International Covenant on Civil and Political Rights, Dec. 9, 1966, 999 U.N.T.S. 171 (ratified June 8, 1992) (hereinafter "ICCPR"), guarantees a broad spectrum of civil and political rights to individuals within signatory nations. *See* Kristen D. A. Carpenter, *The International Covenant on Civil and Political Rights: A Toothless Tiger?*, 26 N.C. J. Int'l L. & Com. Reg. 1, 5 (2000). The United Nations General Assembly opened the ICCPR for signatures in 1966, and the United States ratified it on June 8, 1992. *See id.* Duarte contends that violations of Articles 9, 12(4), 13, and 14 of the ICCPR warrant dismissal of the indictment against him. We review the provisions of each article in turn.

Article 9(1) states that arrests should be performed in accordance with law: "No one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law." Article 9(4) states that, after arrest, an arrestee is entitled to a hearing: "Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that a court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful." Duarte argues that his arrest was contrary to Ecuadorian procedures and the

procedures of the Vienna Convention and that he was not given a hearing to determine the legality of his arrest.

Article 12(4) states: "No one shall be arbitrarily deprived of the right to enter his own country." Duarte contends that, because he was not allowed to enter Colombia after his arrest in Ecuador, this provision of the ICCPR was violated.

Article 13 prevents a person from being expelled from a country without a hearing:

> An alien lawfully in the territory of a State Party to the present Covenant may be expelled therefrom only in pursuance of a decision reached in accordance with law and shall, except where compelling reasons of national security otherwise require, be allowed to submit the reasons against his expulsion and to have his case reviewed by, and be represented for the purpose before, the competent authority or a person or persons especially designated by the competent authority.

Duarte contends that he was not granted an opportunity to argue against expulsion from Ecuador before he was expelled into the custody of the United States.

Article 14(1) provides: "All persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law." Duarte contends that his rights were violated under this article because he was given no hearing — fair,

public, competent, independent, impartial, or otherwise — before being flown to the United States.

While the violations alleged by Duarte may run afoul of the ICCPR, the ICCPR does not appear to afford him any relief. First, the plain language of the ICCPR indicates that its provisions govern the relationship between a State and the individuals within the State's territory. *United States v. Duarte-Acero*, 208 F.3d 1282, 1286 (11th Cir. 2000). Article 2(1) requires that "[e]ach State Party to the present Covenant undertake to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant." All of the violations alleged by Duarte occurred in Ecuador, not the United States. The United States is not obligated to provide relief for alleged violations of the ICCPR committed by other nations.

Furthermore, the ICCPR does not create judicially-enforceable individual rights. Treaties affect United States law only if they are self-executing or otherwise given effect by congressional legislation. *Whitney v. Robertson*, 8 S. Ct. 456, 458 (1888); *United States v. Postal*, 589 F.2d 862, 875 (5th Cir. 1979). Articles 1 through 27 of the ICCPR are not self-executing. *Duarte-Acero*, 208 F.3d at 1284 n.8; 138 Cong. Rec. S4783-84 (daily ed. Apr. 2, 1992) ("[T]he United States declares that the provisions of Articles 1 through 27 of the [ICCPR] are not self-executing."); *see also*

15

*United States ex rel. Perez v. Warden*, 286 F.3d 1059, 1063 (8th Cir. 2002); *Buell v. Mitchell*, 274 F.3d 337, 372 (6th Cir. 2001); *Beazley v. Johnson*, 242 F.3d 248, 267-68 (5th Cir. 2001); *Igartua de la Rosa v. United States*, 32 F.3d 8, 10 n.1 (1st Cir. 1994) (per curiam). Nor has Congress passed implementing legislation. *Perez*, 286 F.3d at 1063; *Buell*, 242 F.3d at 372. Therefore, the ICCPR is not binding on federal courts.

Because the alleged violations of Duarte's rights occurred in Ecuador, and because the ICCPR is not binding on this court, we conclude that Articles 9, 12(4), 13, and 14 of the International Covenant on Civil and Political Rights do not require the dismissal of the indictment in this case.

## C.  CONSPIRACY TO KILL

Count I of the indictment charges Duarte with conspiring, in violation of 18 U.S.C. § 1117, to kill Martinez and McCullough, the DEA agents, in violation of 18 U.S.C. § 1114. Section 1117 makes it a crime for two people to conspire to violate § 1114: "If two or more persons conspire to violate section 1111, 1114, 1116, or 1119 of this title, and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life." 18 U.S.C. § 1117 (2000). At the time of Duarte's offense, a defendant could be convicted under § 1114 of either murder, as defined in 18 U.S.C. § 1111, or manslaughter, as defined in 18 U.S.C. § 1112. The indictment does not specify

16

whether Duarte conspired to commit murder or manslaughter. The indictment also does not allege what Duarte's state of mind was, and the judge did not instruct the jury regarding a state-of-mind requirement.

Duarte asserts that, in light of *Apprendi*, each aspect of the federal statutory scheme for murder should be read as a different fact that must be found beyond a reasonable doubt. Regarding his conviction, Duarte contends that, because the jury did not find that he had the "malice aforethought" required for a conviction under § 1111, he cannot be sentenced for conspiracy to commit first-degree murder; instead, he can only be sentenced for conspiracy to commit involuntary manslaughter, a violation of § 1112. Duarte further submits that, according to § 1112, the maximum sentence that can be imposed for involuntary manslaughter, in this case, is three years.

Duarte's argument, while creative, misapprehends the statutory scheme. Under § 1117, a person who conspires to violate § 1114 can be imprisoned for any term of years or for life. Even if Duarte had only the state of mind necessary to commit involuntary manslaughter, he still violated § 1114. If, as he contends, he agreed with others only to commit involuntary manslaughter — if such a thing is even possible — then he conspired to violate § 1114 and is therefore guilty of violating § 1117. A person who violates § 1117 can be imprisoned for any term of years or for life. The district court, then, did not abuse its discretion by sentencing Duarte to life in prison.

17

# V. CONCLUSION

Because neither violations of the Vienna Convention on Consular Relations nor violations of the International Covenant on Civil and Political Rights warrant dismissal of the indictment against Duarte, the district court did not abuse its discretion by denying Duarte's motion to dismiss the indictment. Furthermore, because Duarte was found guilty of violating 18 U.S.C. § 1117, the district court did not abuse its discretion by sentencing Duarte to life in prison. Duarte's conviction and sentence are affirmed.

AFFIRMED.