916 A.2d 511

COMMONWEALTH of Pennsylvania, Appellee,

v.

Roger JUDGE, Appellant.

Supreme Court of Pennsylvania.

Submitted: Oct. 5, 2006.

Decided: Feb. 21, 2007.

Robert Brett Dunham, Esq., Defender Association of Philadelphia, Philadelphia, for Roger Judge.

Amy Zapp, Esq., Hugh J. Burns, Jr., Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

## *OPINION*

Justice SAYLOR.

This is an appeal in a capital case from an order dismissing Appellant's petition for habeas corpus or post-conviction relief, arising out of an alleged violation by Canada of Appellant's rights under the International Covenant for Civil and Political Rights.

The background underlying Appellant's conviction for first-degree murder and subsequent death sentence has been previously discussed in this Court's opinion affirming the denial of Appellant's first petition under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546. *See Commonwealth v. Judge*, 568 Pa. 377, 379–385, 797 A.2d 250, 252–255 (2002) ("*Judge II* "). In brief, Appellant was convicted of two counts

of murder in the first degree and one count of possession of an instrument of a crime with regard to the shooting of Christopher Outterbridge and Tabatha Mitchell in Philadelphia on September 14, 1984. Following the penalty hearing, Appellant was sentenced to death for each of the murder convictions, as the aggravating circumstances were found to outweigh the sole mitigating circumstance. The aggravating circumstances found with regard to both victims were that Appellant knowingly created a grave risk of death to another person in addition to the victim, see 42 Pa.C.S. § 9711(d)(7), and that Appellant had a significant history of felony convictions involving the use or threat of violence, see 42 Pa.C.S. § 9711(d)(9). Concerning the murder of Mr. Outterbridge, the jury also found that Appellant had been convicted of another offense for which a sentence of life imprisonment or death was imposable. See 42 Pa.C.S. § 9711(d)(10). With regard to both murders, the sole mitigating circumstance noted by any juror was that Appellant was "under the influence of extreme mental or emotional disturbance." 42 Pa.C.S. § 9711(e)(2). Two days after he was formally sentenced, on June 14, 1987, Appellant escaped from custody. Appellant filed a pro se notice of appeal while a fugitive.

On June 15, 1988, Appellant was arrested by Canadian authorities in connection with a sequence of armed robberies, which occurred in Vancouver. The Canadian court convicted Appellant of two counts of robbery and sentenced him to two ten-year terms of imprisonment, to be served concurrently. The conviction was affirmed on appeal. See Regina v. Judge, No. CA009747, Court of Appeal for British Columbia, Mar. 1, 1991. Canada refused to extradite Appellant to Pennsylvania, pursuant to the extradition treaty between the United States and Canada, which provides that Canada will not extradite any person to face a sentence of death in the United States. See Judge II, 568 Pa. at 384, 797 A.2d at 255 (citing Treaty on Extradition, Dec. 3, 1971, U.S.-Can., 27 U.S.T. 983, T.I.A.S. No. 8237). Instead, Canada required Appellant to serve his complete sentence. See Judge v. Canada, U.N. GAOR, Hum. Rts. Comm., 78th Sess., at ¶ 2.4, U.N. Doc. CCPR/

C/78/D/829/1998 (views published Aug. 5, 2003) (hereinafter *"Judge III "*).[1]

While Appellant was in Canadian custody, this Court issued an opinion affirming his convictions and sentence of death. *See Commonwealth v. Judge,* 530 Pa. 403, 609 A.2d 785 (1992) (*"Judge I "*). Due to his fugitive status, this Court limited its consideration of Appellant's claims to the statutorily mandated areas of review, *see* 42 Pa.C.S. § 9711(h), and review of the sufficiency of the evidence, and explained that a defendant who elects to escape from custody forfeits his right to appellate review, *see Commonwealth v. Passaro,* 504 Pa. 611, 616, 476 A.2d 346, 349 (1984), but that, due to the severity and finality of the sentence of death, review of specified issues was required. *See Judge I,* 530 Pa. at 406, 408, 609 A.2d at 786, 787. Thus, this Court held that Appellant's convictions were supported by sufficient evidence; the sentences of death were not the product of passion, prejudice, or any other arbitrary factor; the aggravating circumstances were supported by the evidence; and the sentences of death were not excessive or disproportionate to the penalty imposed in similar cases. *See Judge I,* 530 Pa. at 406–15, 609 A.2d at 786–91.[2]

On August 9, 1998, Canada deported Appellant to New York, from where he was extradited to Pennsylvania.[3] Appellant had filed a *pro se* petition under the PCRA on January 14, 1997, while still in Canada. Counsel was appointed and filed an amended petition on February 17, 1999, raising claims related to Appellant's convictions and sentences. The common pleas court dismissed Appellant's petition without a hear-

**1.** In Canada, prisoners are entitled to release after serving two-thirds of their sentences, unless the Parole Board of the Correctional Services of Canada finds that the prisoner would commit an offense causing death or serious harm if released early. *See Judge III,* at ¶ 2.4 n. 2.

**2.** Former Chief Justice Zappala, joined by Mr. Justice (now Chief Justice) Cappy, dissented, noting that it was improper to absolutely bar Appellant from attempting to obtain reinstatement of his appeal rights at a later time and that it would be more appropriate to simply quash the appeal. *See id.* at 415–16, 609 A.2d at 791 (Zappala, J., dissenting).

**3.** The record is not clear as to the date Appellant returned to Pennsylvania or concerning the reasons for the involvement of the State of New York.

ing. On appeal, this Court observed that Appellant's petition was timely, as it was filed within one year of the effective date of the amended PCRA, and that the statute's language did not require Appellant to be within the territorial jurisdiction of the Commonwealth when he filed his petition. *See Judge II,* 568 Pa. at 387–88, 797 A.2d at 257–58. This Court held, however, that Appellant was ineligible for relief because he forfeited the right to adjudication of his claims, which were or could have been raised on direct appeal, due to his fugitive status during direct appeal proceedings. *See Judge II,* 568 Pa. at 392, 797 A.2d at 260 (citing *Commonwealth v. Kindler,* 554 Pa. 513, 523, 722 A.2d 143, 148 (1998) ("[I]t would be anomalous to permit Appellant to prevail on this claim and then to subject the trial court to a remand order requiring it to rule on the merits of these same [issues] which were raised, or which could have been raised, at an earlier time and which could have been addressed had Appellant demonstrated some respect for the trial court and legal process.") (internal citation omitted)).[4]

Before this Court's decision on his first PCRA petition, Appellant filed a complaint with the United Nations Human Rights Committee (the "Committee"), claiming that, by deporting him to face a death sentence, Canada violated his rights under the International Covenant for Civil and Political Rights (the "ICCPR"). *See* International Covenant for Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171, 6 I.L.M. 368 (entered into force Mar. 23, 1976). The ICCPR is an international agreement that sets forth substantive and procedural rights to which all persons are entitled and establishes the Committee to monitor States–Parties' compliance with the treaty's provisions. While general reporting requirements are provided for within the ICCPR itself, it is the First Optional Protocol to the ICCPR that allows for suits by individuals who claim that their rights under the agreement have been violated. *See* Optional Protocol to the International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171, 6

4. Former Chief Justice Zappala and Former Justice Nigro concurred in the result only.

I.L.M. 383. The United States ratified the ICCPR in 1992, *see* 138 CONG. REC. S4781 (daily ed. Apr. 2, 1992), but has not adopted the First Optional Protocol. Canada, however, is a signatory and thus may be subject to individual complaints before the Committee. *See* Office of the United Nations High Commissioner for Human Rights, *Ratifications and Reservations, at* http://www.ohchr.org/english/countries/ratification/5. htm (last updated Dec. 6, 2006).

With regard to capital punishment, Article 6 of the ICCPR provides:

1. Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life.

2. In countries which have not abolished the death penalty, sentence [sic] of death may be imposed only for the most serious crimes in accordance with the law in force at the time of the commission of the crime and not contrary to the provisions of the present Covenant and to the Convention on the Prevention and Punishment of the Crime of Genocide. This penalty can only be carried out pursuant to a final judgement [sic] rendered by a competent court.

\* \* \*

4. Anyone sentenced to death shall have the right to seek pardon or commutation of the sentence. Amnesty, pardon or commutation of the sentence of death may be granted in all cases.

5. Sentence [sic] of death shall not be imposed for crimes committed by persons below eighteen years of age and shall not be carried out on pregnant women.

6. Nothing in this article shall be invoked to delay or to prevent the abolition of capital punishment by any State Party to the present Covenant.

6 I.L.M. at 370. When signing the ICCPR, the United States noted its reservations with regard to Article 6, stating that "the United States reserves the right, subject to its Constitu-

tional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment, including such punishment for crimes committed by persons below eighteen years of age." *See* 138 CONG. REC. S4781, S4783.[5] Additionally, the United States declared that the provisions of the ICCPR were not self-executing, *see id.* at S4784, and thus would require further Congressional action to be enforceable within the United States. *See* RESTATEMENT (THIRD) FOREIGN RELATIONS LAW OF THE UNITED STATES § 111(3) & (4), cmt. h (1987).

In his individual complaint against Canada, submitted to the Committee on August 7, 1998, Appellant asserted that his deportation to face a sentence of death, without assurances that the sentence would not be carried out, violated his right to life under Article 6, his right to be free from cruel and inhuman treatment or punishment under Article 7,[6] and his right to an effective remedy under Article 2, Paragraph 3.[7] Appellant also claimed that, by deporting him before an appeal could be taken from the rejection of his application for a stay

5. This reservation was noted in reference to Article 6, Paragraph 5, which does not allow minors to be executed. The United States Supreme Court has since held that the execution of minors violates the Eighth Amendment. *See Roper v. Simmons*, 543 U.S. 551, 568, 125 S.Ct. 1183, 1194, 161 L.Ed.2d 1 (2005). The reservation is equally applicable, however, to other situations which might violate the ICCPR.

6. Article 7 of the ICCPR states, in pertinent part, that "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." 6 I.L.M. at 370.

7. Article 2, Paragraph 3 of the ICCPR states:

 Each State Party to the present Covenant undertakes:

 (a) To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;

 (b) To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy;

 (c) To ensure that the competent authorities shall enforce such remedies when granted.

 6 I.L.M. at 369.

of deportation, Canada violated his rights under Articles 2, 6, and 7. *See Judge III,* at ¶ 3.1–3.3.[8]

In response, Canada observed that no provision of the ICCPR or domestic law in effect at the time of Appellant's deportation required the State–Party to obtain assurances that the death penalty would not be carried out before deporting a person to a country that had not abolished capital punishment. Further, Canada noted that the Committee had previously determined that Article 6 of the ICCPR did not necessarily require a refusal to extradite or to seek assurances when transferring a person to face a sentence of death. *See Kindler v. Canada,* U.N. GAOR, Hum. Rts. Comm., 48th Sess., at ¶ 14.6, U.N. Doc. CCPR/C/48/D470/1991 (views published Nov. 11, 1993). With regard to the adequacy of appellate review, Canada asserted that Appellant had been afforded sufficient review of his deportation order, as well as the right to challenge any alleged human rights violations, in the Canadian courts and that requiring a stay pending exhaustion of all possible appeals would entail allowing convicted murderers to remain in Canada without a guarantee that they would be continually detained during the appeal process.

The Committee did not accept Canada's arguments and, instead, found that Appellant's right to life under Article 6 of the ICCPR had been violated by his deportation without receipt of assurances that his death sentence would not be carried out. *See Judge III,* at ¶ 10.6. The Committee reasoned that there is an obligation under Article 6 for States–Parties that have abolished the death penalty "not to expose a person to the real risk of its application," and thus either

8. Appellant also raised several claims concerning prison conditions in Canada and the legality of his detention in Canada while awaiting imposition of a death sentence upon his transfer to the United States, but the Committee found that Appellant had not substantiated these claims and did not consider them on the merits. *See Judge III,* at ¶ 7.1–7.8. Notably, Appellant's claim that Canada participated in a violation of his right to an appeal under Article 14, Paragraph 5, *see* 6 I.L.M. at 373 ("Everyone convicted of a crime shall have the right to his conviction and sentence being reviewed by a higher tribunal according to law."), due to the limited appeal afforded to fugitives under Pennsylvania law, was also found to be unsubstantiated. *See Judge III,* at ¶ 7.7.

deportation or extradition without assurances that a death sentence will not be carried out violate the ICCPR. *See Judge III,* at ¶ 10.4. In reaching this conclusion, the Committee acknowledged that it had previously determined that it was not a per se violation of Article 6 to deport a person to face a death sentence, *see Kindler,* U.N. GAOR, Hum. Rts. Comm., 48th Sess., at ¶ 14.6, U.N. Doc. CCPR/C/48/D470/1991, but noted that changes in both Canadian and international law, including *United States v. Burns,* [2001] 1 S.C.R. 283, 2001 SCC 7 (holding that the Canadian Constitution requires that assurances be received before transfer may occur), and Canada's recent accession to the Second Optional Protocol to the ICCPR, *see* Second Optional Protocol to the International Covenant on Civil and Political Rights, Dec. 15, 1989, U.N. Doc. A–RES–44–128 (entered into force July 11, 1991) (aiming at abolition of the death penalty), provided sufficient reason to revise the Committee's prior interpretation of Canada's obligations under the treaty. *See Judge III,* at ¶ 10.3.

In addition, the Committee agreed with Appellant that Canada's failure to provide him with the opportunity to exercise an available avenue of appellate review prior to his deportation violated his rights under Article 2, Paragraph 3, in connection with Article 6. *See Judge III,* at ¶ 10.9. In this regard, the Committee emphasized that Appellant was removed from Canada within hours of the Superior Court of Quebec's decision not to stay his deportation, *see Judge III,* at ¶ 10.8, and concluded that, since appellate review was available but precluded by the deportation, sufficient consideration of Appellant's right to life was not afforded by the State–Party. *See Judge III,* at ¶ 10.8–10.9. The views of the Committee were adopted on August 5, 2002, and formally published on August 13, 2003. Following publication of the Committee's views, Appellant filed the present petition, asserting jurisdiction under either the PCRA or the statutory and constitutional right to habeas corpus relief and arguing that Canada's asserted violation of his human rights under the ICCPR requires that his sentence be reduced to life imprisonment or that he be returned to Canada to be deported or extradited in compli-

ance with the Committee's ruling.[9, 10] The post-conviction court, assuming that Appellant's claims were cognizable under the PCRA, dismissed his contentions regarding the ICCPR on the ground that habeas proceedings raising the same arguments were pending in federal court.[11]

## I.

The threshold issue in this matter is whether Appellant's claims are cognizable under the PCRA or, instead, if claims of this nature would be more properly styled as a petition for writ of habeas corpus. In this regard, Appellant contends that a petition for habeas corpus is the most appropriate method for challenging his execution on the ground that his deportation from Canada to face a sentence of death

9. On August 16, 2002, Appellant filed a second PCRA petition based on the United States Supreme Court's ruling that execution of mentally retarded persons violates the Eighth Amendment's prohibition on cruel and unusual punishment. See Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 2252, 153 L.Ed.2d 335 (2002). However, all of Appellant's claims in this regard have been withdrawn due to this Court's determination that mental retardation may be established, for purposes of sentencing, by reference to the standards of either the American Association of Mental Retardation or the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, see Commonwealth v. Miller, 585 Pa. 144, 155, 888 A.2d 624, 631 (2005), which Appellant acknowledges that he cannot satisfy. See Brief of Appellant at 11–12.

10. Appellant also filed a civil suit against Canada in federal court, requesting monetary damages for the asserted violation of his right to life under the ICCPR. The Third Circuit dismissed the case in a non-precedential decision on the ground that there was no subject matter jurisdiction over the civil action against a foreign state under either the Foreign Sovereign Immunities Act or the ICCPR itself. See Judge v. Canada, No. 05–4954, 208 Fed.Appx. 106, 108, 2006 WL 3539286, at *2 (C.A.3 2006).

11. As an initial matter, it must be noted that the post-conviction court erred in dismissing Appellant's claims under the ICCPR on this ground, as this Court has held that pending federal proceedings do not justify the dismissal of a petition under the PCRA. See Commonwealth v. Wharton, 575 Pa. 166, 835 A.2d 1273 (2003) (per curiam) ("A post-conviction relief act petition may not be dismissed on the basis that litigation is pending in federal court.") (citing Commonwealth v. Whitney, 572 Pa. 468, 817 A.2d 473 (2003)). However, this Court may affirm on any ground. See Commonwealth v. Fisher, 582 Pa. 276, 287 n. 11, 870 A.2d 864, 870 n. 11 (2005) ("A ruling or decision of a lower court will be affirmed if it can be supported on any basis despite the lower court's assignment of a wrong reason.") (quoting Commonwealth v. Terry, 513 Pa. 381, 404, 521 A.2d 398, 409 (1987)).

violated his rights under the ICCPR. Appellant observes that the legislative intent in enacting the PCRA was to address, in a single petition, all claims related to the legality or constitutionality of the proceedings by which an individual has been convicted and sentenced. *See* 42 Pa.C.S. § 9542. He concludes, however, that the right to petition for a writ of habeas corpus remains separately available in situations, like the present matter, where the basis of the arguments is not contingent upon the presence of error in either the guilt or penalty phases of a trial. This is due to the constitutional and statutory protection of habeas corpus. *See* PA. CONST. Art. I, § 14 ("[T]he privilege of the writ of habeas corpus shall not be suspended, unless when in case of rebellion or invasion the public safety may require it."); 42 Pa.C.S. § 6501 (same). Further, Appellant asserts that the traditional purposes of habeas corpus are advanced by addressing his claims regarding his deportation from Canada in violation of the ICCPR outside the framework of the PCRA, as the writ of habeas corpus is at the core of protecting fundamental rights, including the inherent right to life. *See, e.g., Stander v. Kelley,* 433 Pa. 406, 425, 250 A.2d 474, 485 (1969) (Roberts, J., concurring) (noting that the writ of habeas corpus is "the ultimate and essential safeguard of individual rights and that the courts of the Commonwealth of Pennsylvania must and will continue to make its protections available").[12]

12. The Commonwealth argues that, to the extent Appellant's claims regarding his deportation are deemed to be properly raised in a petition for writ of habeas corpus, they are waived because his notice of appeal states only that he is appealing from the denial of PCRA relief and his statements of jurisdiction and the standard and scope of review do not mention habeas corpus. Given our conclusion that Appellant's claims concerning the Committee's decision that his deportation from Canada was in violation of the ICCPR have no merit, however, we need not resolve the Commonwealth's waiver argument. *See Commonwealth v. Hughes,* 581 Pa. 274, 304, 865 A.2d 761, 778–79 (2004) ("[W]e need not settle this issue [of waiver] presently, as Appellant's claim may be resolved upon a merits analysis."). Nevertheless, it may be noted that Appellant's notice of appeal does not exclusively specify the denial of PCRA relief, *see* Notice of Appeal, March 22, 2005 (noting an appeal "from each and every aspect of the Court of Common Pleas' denial of post-conviction relief"), and Appellant expressly raises habeas corpus as a ground for relief in his Rule 1925(b) statement, *see* Statement of Matters Complained of on Appeal, March 30, 2005, at ¶ 7. Further,

Alternatively, Appellant argues that his claims concerning the Committee's determination that his deportation from Canada to face the death penalty violated his rights under the ICCPR are cognizable under the PCRA in one of two ways. First, Appellant asserts that his execution, which he believes would violate the ICCPR, undermines the truth-determining process such that the sentence cannot be deemed reliable. *See* 42 Pa.C.S. § 9543(a)(2)(i). Next, Appellant speculates that his death sentence is greater than the lawful maximum because, in his view, the lawful maximum sentence under international law is life imprisonment. *See* 42 Pa.C.S. § 9543(a)(2)(vii). Further, Appellant argues that his petition is not time barred, as his claims fall within two of the exceptions to the one-year limitation contained within the PCRA. *See* 42 Pa.C.S. § 9545(b)(1). In this regard, Appellant contends that government officials, specifically the Canadian officials who deported him and the United States officials who accepted him upon his deportation, interfered with his ability to present his claims previously because he was not afforded the opportunity to challenge his deportation before he was transferred to the Commonwealth's custody. *See* 42 Pa.C.S. § 9545(b)(1)(i). Appellant also asserts that the facts upon which his claims are based, namely, the Committee's ruling that Canada violated the ICCPR by deporting him to face a death sentence, could not have been known prior to the publication of the Committee's views in 2003. *See* 42 Pa.C.S. § 9545(b)(1)(ii).

The Commonwealth argues that Appellant's claims are properly raised in a PCRA petition because, as Appellant himself asserts, they fall within the ambit of that statute's eligibility requirements. *See* 42 Pa.C.S. § 9543. In this regard, the Commonwealth observes that both the PCRA and the statutory provision for habeas corpus contemplate that the PCRA subsumes the writ of habeas corpus when that statute

Appellant's statement of jurisdiction includes Article I, Section 14 of the Pennsylvania constitution, which protects the right to petition for habeas corpus, and his statement of the scope and standard of review, while arguably limited, merely asserts the standard of review for an error of law. *See* Brief of Appellant at 1.

provides a remedy for the claim. *See* 42 Pa.C.S. § 9542 ("The action established in this subchapter shall be the sole means of obtaining collateral relief and encompasses all other common law and statutory remedies for the same purpose that exist when this subchapter takes effect, including habeas corpus and coram nobis."); 42 Pa.C.S. § 6503 ("[T]he writ of habeas corpus shall not be available if a remedy may be had by post-conviction hearing proceedings authorized by law."). Thus, the Commonwealth explains, the Legislature clearly intended that the writ of habeas corpus would continue to exist only in situations, unlike the present matter, where there is no remedy under the PCRA. *See Commonwealth v. Fahy,* 558 Pa. 313, 331–32, 737 A.2d 214, 223–24 (1999); *Commonwealth v. Peterkin,* 554 Pa. 547, 552, 722 A.2d 638, 640 (1998).

Further, the Commonwealth contends that Appellant's petition does not meet the jurisdictional time limitation of the PCRA, as his claims regarding his deportation from Canada to face a death sentence do not satisfy any of the statutory exceptions. *See* 42 Pa.C.S. § 9545(b)(1). Accordingly, the Commonwealth argues that, even if the Legislature intended for foreign officials to be encompassed within the governmental interference exception, Appellant has not set forth how Canada's actions prevented him from filing a timely PCRA petition, especially in light of the fact that he did file a timely petition before his deportation and amended it upon his return to the United States. Similarly, the Commonwealth asserts that Appellant's reliance on the Committee's published determination as a new fact that could not have been discovered previously is misplaced, as the fact underlying his claims is his deportation itself, of which Appellant must have been aware at the time he filed his amended PCRA petition, from the United States, in 1999. Thus, the Commonwealth concludes that Appellant's claim that his deportation from Canada violated his rights under the ICCPR is both untimely and waived, as it could have been raised in his first PCRA petition. *See* 42 Pa.C.S. § 9544(b).

■ The Commonwealth is correct in asserting that the PCRA subsumes all forms of collateral relief, including habeas

corpus, to the extent that a remedy is available under such enactment. *See Peterkin,* 554 Pa. at 552, 722 A.2d at 640. In light of the broad applicability of the traditional writ of habeas corpus, however, in conjunction with the legislative intent to channel post-conviction claims into the PCRA's framework, this Court has acknowledged that the scope of the PCRA cannot be narrowly confined to its specifically enumerated areas of review. In *Commonwealth v. Lantzy,* 558 Pa. 214, 223, 736 A.2d 564, 569–70 (1999), for example, we held that claims of ineffective assistance related to counsel's failure to perfect a direct appeal were cognizable under the PCRA, notwithstanding the fact that such claims did not precisely implicate the adjudication of guilt or innocence. *See also Commonwealth v. Chester,* 557 Pa. 358, 374, 733 A.2d 1242, 1250 (1999) (holding that the PCRA encompasses claims related to the penalty phase of a capital case, even though such claims do not directly challenge the underlying conviction).

Appellant correctly notes, however, that this Court has never held that habeas corpus cannot provide a separate remedy, in appropriate circumstances. Indeed, the boundaries of cognizable claims under the PCRA can only be extended so far as is consistent with the purposes of the statute, and we believe that Appellant's claim concerning his deportation from Canada to face a death sentence falls outside the intended scope of the PCRA. *See* 42 Pa.C.S. § 9542 ("This subchapter provides for an action by which persons convicted of crimes they did not commit and persons serving illegal sentences may obtain collateral relief."); *Peterkin,* 554 Pa. at 557–58, 722 A.2d at 643 ("The purpose of the law is not to provide convicted criminals with the means to escape well-deserved sanctions, but to provide a reasonable opportunity for those who have been wrongfully convicted to demonstrate the injustice of their conviction."). Appellant is not asserting his innocence of the underlying crimes or that his sentence was illegal when imposed; his claim is that executing him would violate international law because the Committee found that Canada violated his rights under the ICCPR by deporting him to face a sentence of death without obtaining assurances

that the sentence would not be imposed. The Committee's determination and the facts upon which it is based, regardless of their validity, have no connection to the truth-determining process and do not render the underlying adjudication of guilt or innocence, which took place in the United States more than ten years earlier, unreliable. *See, e.g., Coady v. Vaughn,* 564 Pa. 604, 613, 770 A.2d 287, 293 (2001) (Castille, J., concurring) ("The specifically enumerated, substantive claims deemed reviewable under the PCRA all have to do with matters affecting the conviction and sentence.").

In addition, Appellant's sentence is not greater than the lawful maximum, as it falls within the statutory limits. *See Commonwealth v. Vasquez,* 560 Pa. 381, 388, 744 A.2d 1280, 1284 (2000) (citing *Commonwealth v. Miller,* 541 Pa. 531, 562, 664 A.2d 1310, 1325 (1995)). Since the maximum penalty for first-degree murder is death, *see* 18 Pa.C.S. § 1102(a)(1), Appellant's sentence is legal under Pennsylvania law. The sentence is also legal under the ICCPR, which allows States–Parties to impose the death penalty for the most serious crimes pursuant to laws in effect at the time the crimes were committed. *See* 6 I.L.M. at 370, Art. 6(2). In essence, Appellant is challenging the continued vitality of his sentence, a claim that is at the heart of habeas corpus. *Cf. Commonwealth v. Isabell,* 503 Pa. 2, 10, 467 A.2d 1287, 1291 (1983) (holding that a challenge to the interpretation of a sentence by the Bureau of Corrections could be raised in a petition for writ of habeas corpus because it was "not a direct or collateral attack on the conviction or sentence imposed by the trial court" and thus was not cognizable under the precursor to the PCRA); *Commonwealth ex rel. Bryant v. Hendrick,* 444 Pa. 83, 88–89, 280 A.2d 110, 112–113 (1971) (determining that a claim that prison conditions constitute cruel and unusual punishment may be raised in a petition for writ of habeas corpus). Thus, since the PCRA does not provide a remedy for Appellant's claims regarding the Committee's determination that his deportation from Canada violated the ICCPR, they may be raised in a petition for writ of habeas corpus.[13]

13. Because Appellant's arguments raise only issues of law, a remand for a hearing is not required. *See Commonwealth ex rel. Butler v.*

## II.

On the merits, Appellant argues that the Commonwealth must provide a remedy for Canada's violation of his human rights because, as a party to the ICCPR, the United States government and its constituent states are required to enforce the provisions of the treaty as binding federal law. In this regard, Appellant observes that international law, regardless of Congressional enactments, is "part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination." *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900); *see also Filartiga v. Pena–Irala,* 630 F.2d 876, 887 (2d Cir.1980) ("[I]n the absence of a congressional enactment, United States courts are 'bound by the law of nations, which is a part of the law of the land.' ") (footnote omitted) (citing *The Nereide,* 13 U.S. (9 Cranch) 388, 422, 3 L.Ed. 769 (1815)). In further support of this proposition, Appellant cites the Vienna Convention on the Law of Treaties, which the United States has signed. *See* Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331, 8 I.L.M. 679, 690, art. 26 ("Every treaty in force is binding upon the parties to it and must be performed by them in good faith.") (entered into force Jan. 27, 1980); *see also* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 321 (1987) (same).

Further, Appellant argues that the Supremacy Clause of the United States Constitution mandates treatment of international treaties as equivalent to federal law.[14] Thus, Appellant

*Rundle,* 407 Pa. 535, 536, 180 A.2d 923, 924 (1962) ("A hearing is not required when there is no issue of fact to be decided or when the facts averred by relator, even if believed, are insufficient to warrant granting the writ of habeas corpus."). Ordinarily, an appellate court will review a grant or denial of a petition for writ of habeas corpus for abuse of discretion, *see, e.g., Commonwealth v. Reese,* 774 A.2d 1255, 1261 (Pa.Super.2001), but for questions of law, our standard of review is de novo, and our scope of review is plenary. *See Buffalo Township v. Jones,* 571 Pa. 637, 644 n. 4, 813 A.2d 659, 664 n. 4 (2002).

**14.** The Supremacy Clause states:

maintains that, once the ICCPR was ratified by the Senate in 1992, it became the supreme law of the land and binding on federal and state courts. Appellant concludes, therefore, that obligations under the ICCPR supersede inconsistent state statutes, including the death penalty as applied to his case. *See generally* Michelle S. Friedman, *The Uneasy U.S. Relationship with Human Rights Treaties: The Constitutional Treaty System and Non–Self–Execution Declarations,* 17 FLA. J. INT'L L. 187, 195–200 (2005) (discussing the effect of treaties as domestic law). Appellant would have this Court provide a remedy for Canada's violation of the ICCPR because the treaty obligates States–Parties to effectively remedy such violations, *see* 6 I.L.M. at 369, Art. 2(3), and, as binding federal law, requires courts to enforce its provisions.

The only way to comply with the ICCPR, Appellant contends, is to consider the Committee's ruling as binding authority, as it was an adjudication rendered by a tribunal of competent jurisdiction that created an individual right in Appellant with respect to the illegality of his deportation from Canada. If his deportation is deemed illegal, Appellant claims, the Commonwealth lacks jurisdiction to carry out his sentence because, had Appellant not been unlawfully deported, he would not be subject to the death penalty upon his return to Pennsylvania. Instead, according to the Committee's views, Canada would have been required to obtain assurances from the United States that Appellant would not be executed. *See Judge III,* at ¶ 10.6.

In this regard, Appellant analogizes the present situation to *Commonwealth v. Boczkowski,* 577 Pa. 421, 846 A.2d 75 (2004), in which the defendant was extradited to North Carolina to face a second murder charge in violation of a stay of extradition order. The ensuing conviction and life sentence provided

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. CONST. Art. VI, cl. 2.

an aggravating circumstance rendering the defendant eligible to face the death penalty in the Pennsylvania case. Because this Court determined that the unlawful action creating the aggravating circumstance "introduced an element of arbitrariness into the death-eligibility process," we vacated the sentence of death and remanded for imposition of a sentence of life imprisonment. *See id.* at 467–68, 846 A.2d at 102–103.[15] Thus, Appellant contends that, because his deportation from Canada was in violation of binding international law, his sentence of death is arbitrary and must be vacated.

Finally, Appellant argues that the United States officially participated in the violation of his human rights under the ICCPR by accepting his illegal transfer from Canada. In this connection, Appellant distinguishes *United States v. Alvarez–Machain,* 504 U.S. 655, 670, 112 S.Ct. 2188, 2197, 119 L.Ed.2d 441 (1992), wherein the United States Supreme Court held that the forcible abduction of the defendant from Mexico did not prohibit his trial in a United States court. This decision was, in part, based upon the fact that the extradition treaty between the United States and Mexico did not address kidnapping, and, thus, the defendant did not have a right to be returned to the United States only in accordance with the terms of the treaty. *See id.* at 660–61, 112 S.Ct. at 2192 (citing *Ker v. Illinois,* 119 U.S. 436, 443, 7 S.Ct. 225, 229, 30 L.Ed. 421 (1886)). *See also* 42 Pa.C.S. § 9171 ("Whenever a treaty is in force providing for the transfer of convicted offenders between the United States and a foreign country, the Governor ... is authorized to give the approval of the Commonwealth to transfer as provided in the treaty."). Appellant, however, believes that, because the Committee affirmatively determined that his deportation from Canada violated the ICCPR and the United States acted under color of the law in accepting the transfer, he had a right to only be

15. Justice Eakin filed a concurring and dissenting opinion, observing that it was not clearly arbitrary for the Commonwealth to extradite the defendant because, as the trial court determined, there was a valid reason to allow extradition before the conclusion of the Pennsylvania matter, namely, protecting the defendant's speedy trial rights in both proceedings. *See Boczkowski,* 577 Pa. at 471, 846 A.2d at 105 (Eakin, J., concurring and dissenting).

deported according to the terms of the ICCPR as interpreted by the Committee. *See, e.g., Lee v. Florida,* 392 U.S. 378, 386, 88 S.Ct. 2096, 2101, 20 L.Ed.2d 1166 (1968) (under the supremacy clause, "no court, state or federal, may serve as an accomplice in the willful transgression" of federal laws that bind judges in every state).

In response to Appellant's arguments, the Commonwealth relies primarily on its assertion that neither the decisions of the Committee nor the ICCPR itself are binding on this Court. In this regard, the Commonwealth accuses Appellant of ignoring the distinctions between self-executing and non-self-executing treaties and federal cases holding that the ICCPR does not have binding force. Since the United States declared, when signing the ICCPR, that the treaty would not be self-executing, *see* 138 CONG. REC. S4781, S4784, its provisions cannot be enforced in United States courts absent enabling legislation. *See* RESTATEMENT (THIRD) FOREIGN RELATIONS LAW § 111; Carlos Manuel Vazquez, *The Four Doctrines of Self–Executing Treaties,* 89 AM. J. INT'L L. 695, 695–96 (1995). Congress, however, has not enacted any such law with regard to the ICCPR. *See Sosa v. Alvarez–Machain,* 542 U.S. 692, 735, 124 S.Ct. 2739, 2767, 159 L.Ed.2d 718 (2004); *Beshli v. Dep't of Homeland Security,* 272 F.Supp.2d 514, 526 (E.D.Pa.2003).

Further, the Commonwealth observes that the Committee itself, as well as numerous commentators, have stated that its decisions are not binding authority. *See* U.N. GAOR, Hum. Rts. Comm., 43d Sess., Annual Report at ¶ 645, U.N. Doc. A/43/40 (1988) ("The Committee's decisions on the merits are non-binding recommendations."); *see also, e.g.,* Lawrence R. Helfer & Anne–Marie Slaughter, *Toward a Theory of Effective Supranational Adjudication,* 107 YALE L.J. 273, 279 (1997) (noting that the Committee "issues nonbinding 'views' indicating whether a state has violated the International Covenant on Civil and Political Rights"). In addition, the Commonwealth emphasizes that the United States is not a party to the First Optional Protocol to the ICCPR, which allows for Committee adjudications of individual complaints regarding alleged

human rights violations. *See* Office of the United Nations High Commissioner for Human Rights, *Ratifications and Reservations, at* http: //www.ohchr.org/english/countries/ratification/5.htm (last updated Dec. 6, 2006). Thus, the Commonwealth concludes, the ICCPR, the First Optional Protocol, and the Committee's decision in this matter are not part of federal law such that this Court is obligated to provide a remedy for Canada's violation of Appellant's rights under the ICCPR.

The Commonwealth also analogizes this matter to a recent decision of the United States Supreme Court, *see Sanchez–Llamas v. Oregon,* —— U.S. ——, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006), which, inter alia, addressed the authoritative value of a decision of the International Court of Justice (ICJ) regarding interpretation of the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 100–101, T.I.A.S. No. 6820. In this regard, the Supreme Court observed that determining the effect of treaties as a matter of federal law "is emphatically the province and duty of the judicial department" of the United States. *Id.* at ——, 126 S.Ct. at 2684 (quoting *Marbury v. Madison,* 1 Cranch 137, 177, 2 L.Ed. 60 (1803)). Further, the decisions of the ICJ have "no binding force except between the parties and in respect of that particular case." *Id.* at ——, 126 S.Ct. at 2684 (quoting Statute of the International Court of Justice, Art. 59, 59 Stat. 1062, T.S. No. 993 (1945)). Thus, since interpretations of treaties rendered by the ICJ in individual cases are not controlling on future cases of the ICJ itself, the Supreme Court determined that such interpretations were not intended to be binding on United States courts. *See id.* at ——, 126 S.Ct. at 2684. Relying on *Sanchez–Llamas,* the Commonwealth concludes that decisions of the Committee, which are not even binding as between the parties, cannot be controlling on this Court.

The Commonwealth further contends that Appellant's analogy to *Boczkowski, see* 577 Pa. at 421, 846 A.2d at 75, is inapt, as it was not his illegal deportation that caused him to be sentenced to death. More specifically, the result in *Boczkowski,* in the Commonwealth's view, was based upon the facts

that the defendant was extradited in violation of a standing court order and that it was the illegal extradition itself that created the only aggravating circumstance. By contrast, the Commonwealth argues, Appellant's deportation was not in violation of binding law and did not have any effect on his underlying conviction or sentence.

In addition, the Commonwealth maintains that Appellant's execution would not render the state or federal governments complicit in a human rights violation. Instead, the Commonwealth relies on *Alvarez–Machain, see* 504 U.S. at 670, 112 S.Ct. at 2197, in arguing that no binding authority mandates that Appellant be deported in a specific way such that he has a right not to be subject to his lawfully entered sentence. In this regard, the Commonwealth observes that the extradition treaty between the United States and Canada, *see* Treaty on Extradition, 27 U.S.T. 983, T.I.A.S. No. 8237,[16] does not address deportation, just as the treaty between the United States and Mexico did not address kidnapping in *Alvarez–Machain,* 504 U.S. at 668–69, 112 S.Ct. at 2196, and Appellant cannot therefore claim the protections of the extradition treaty. Similarly, the Commonwealth argues that Appellant cannot claim that he has a right to be deported only according to the terms of the ICCPR because the ICCPR's provisions do not directly address deportation, and, indeed, it would have been a violation of the ICCPR for the United States to have refused to accept Appellant upon his deportation from Canada. *See* 6 I.L.M. at 372, Art. 12(4) ("No one shall be arbitrarily deprived of the right to enter his own country.").

 We believe that Appellant, in arguing that this Court must enforce the Committee's determinations, has misappre-

16. Article 6 of the treaty provides:

When the offense for which extradition is requested is punishable by death under the laws of the requesting State and the laws of the requested State do not permit such punishment for that offense, extradition may be refused unless the requesting State provides such assurances as the requested State considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed. Treaty on Extradition, Dec. 3, 1971, amended June 28, 1974, July 29, 1974, Jan. 12, 2001, U.S.-Can., 27 U.S.T. 983, T.I.A.S. No. 8237.

hended the law of treaties. In asserting that all international agreements ratified by the Senate have binding force upon the courts of this country, Appellant ignores the distinction between self-executing and non-self-executing treaties. Indeed, contrary to Appellant's assertion that ratification of the ICCPR rendered the treaty the supreme law of the land, with binding force on both the state and federal governments, ratification is not by itself sufficient to mandate enforcement of a non-self-executing treaty. *See Sanchez–Llamas,* —— U.S. at ——, 126 S.Ct. at 2680; *Sosa,* 542 U.S. at 735, 124 S.Ct. at 2767; *Auguste v. Ridge,* 395 F.3d 123, 133 n. 7 (3d Cir.2005) ("Treaties that are not self-executing do not create judicially-enforceable rights unless they are first given effect by implementing legislation.").[17]

In the course of arguing that this Court must provide a remedy for Canada's violations of the ICCPR, Appellant does not explain how the treaty may be considered legally binding when the Senate specifically declared that it was not self-executing during the ratification process. *See* 138 CONG. REC. S4781, S4784; *see also* RESTATEMENT (THIRD) FOREIGN RELA-TIONS LAW § 111(4)(b) (treaties are non-self-executing "if the Senate in giving consent to a treaty, or Congress by resolution, requires implementing legislation"). *See generally* CUR-TIS A. BRADLEY & JACK L. GOLDSMITH, FOREIGN RELATIONS LAW 385–399 (2003) (discussing non-self-execution declarations in the context of human rights treaties as applied in the United

---

**17.** *Accord* RESTATEMENT (THIRD) FOREIGN RELATIONS LAW § 111(3) ("[A] 'non-self-executing' agreement will not be given effect as law in the absence of necessary implementation."); Friedman, *The Uneasy U.S. Relationship with Human Rights Treaties,* 17 FLA J. INT'L L. at 196–97 ("Nonself-executing treaties ... do not themselves create judicially enforceable federal law; rather, Congress must pass legislation implementing their terms.") (footnote omitted); Michael P. Van Alstine, *Federal Common Law in an Age of Treaties,* 89 CORNELL L.REV 892, 906 (2004) (a non-self-executing "provision leaves the decision on transformation into enforceable federal law to Congress"); Carlos Manual Vazquez, *The Four Doctrines of Self–Executing Treaties,* 89 AM J. INT'L L. 695, 696 (1995) ("The doctrine of self-executing treaties thus serves to distinguish those treaties that require an act of the legislature to authorize judicial enforcement from those that require an act of the legislature to remove or modify the courts' enforcement power (and duty).").

States). Appellant's reliance on the Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331, 8 I.L.M. 679 (entered into force January 27, 1980), for the proposition that treaties, once signed, must be enforced by domestic courts is similarly misplaced. Although the Vienna Convention has been treated as persuasive authority by United States courts, it has never been officially ratified by the Senate. *See* Maria Frankowska, *The Vienna Convention on the Law of Treaties Before United States Courts*, 28 VA. J. INT'L L. 281, 286–87 (1988) (explaining that the Vienna Convention is treated as binding only to the extent that it embodies customary international law). Further, the United States Supreme Court has stated that the ICCPR is not self-executing and, thus, does not create obligations that are enforceable in domestic courts. *See Sosa*, 542 U.S. at 735, 124 S.Ct. at 2767. *See generally* Brian L. Porto, Annotation, *Construction and Application of International Covenant on Civil and Political Rights*, 11 A.L.R. FED.2D 751 (2006) ("The federal courts have consistently denied relief to parties seeking to enforce in American courts rights claimed under the ICCPR.").

 In addition, Appellant relies primarily on his view of the ICCPR's authoritative force to buttress his argument that the Committee's interpretation of the treaty as applied to his case should be binding on this Court such that he is entitled to an appropriate remedy. However, as noted above, the ICCPR, as a non-self-executing treaty, does not have the force of federal law absent Congressional action. Further, the Committee itself has stated that its determinations are not binding, even as between the parties. *See* U.N. GAOR, Hum. Rts. Comm., 43d Sess., Annual Report at ¶ 645, U.N. Doc. A/43/40 (1988). In this regard, the Commonwealth's analogy to *Sanchez–Llamas* is persuasive, as decisions of the ICJ, which do have binding force on the parties as a matter of international law, are not binding with regard to interpretations of treaties as a matter of United States law. *See Sanchez–Llamas*, —— U.S. at ——, 126 S.Ct. at 2683 (holding that interpretations of the ICJ are not binding, but deserve

"respectful consideration") (quoting *Breard v. Greene,* 523 U.S. 371, 375, 118 S.Ct. 1352, 1354, 140 L.Ed.2d 529 (1998)).

Moreover, at least one federal court has refused to provide a remedy for a violation of the ICCPR committed by another country. In *United States v. Duarte–Acero,* 296 F.3d 1277 (11th Cir.2002), the Eleventh Circuit Court of Appeals held that dismissal of an indictment was not required where the circumstances of the defendant's arrest, namely, his expulsion from Ecuador to the United States without a hearing in the Ecuadorian courts, allegedly violated the ICCPR. Even if the arrest was in violation of the ICCPR, the court concluded, "[t]he United States is not obligated to provide relief for alleged violations of the ICCPR committed by other nations." *Id.* at 1283. Further, the court supported this holding with the fact that the ICCPR is not binding on federal courts because it is a non-self-executing treaty and Congress has not enacted any implementing legislation. *See id.* Our decision in this matter is also in accord with case law from other states, which have similarly refused to overturn death sentences based on alleged violations of the ICCPR. *See, e.g., Simmons v. Commonwealth,* 191 S.W.3d 557, 567 (Ky.2006) (holding that a death sentence did not violate Article 6 because the ICCPR is not binding on courts in the United States and does not require States–Parties to abolish the death penalty); *Baird v. State,* 831 N.E.2d 109, 115 (Ind.2005) (holding that defendant sentenced to death could not show a reasonable probability of success on the merits of his international law claim because the ICCPR did not create obligations enforceable in United States courts).

We also agree with the Commonwealth that *Boczkowski* is distinguishable. The result in that case was dictated by the fact that the sole reason the defendant was eligible for the death penalty was his unlawful extradition. By contrast, in the present matter, this Court concluded on direct appeal that the aggravating factors leading to Appellant's sentence were justified. *See Judge I,* 530 Pa. at 414–15, 609 A.2d at 790–91. Indeed, Appellant is not challenging his eligibility for the death penalty or subsequent capital sentence but instead his

execution itself in light of the Committee's decision, rendering *Boczkowski* inapplicable.

In sum, we hold that, although Appellant was entitled to raise his claim in a petition for writ of habeas corpus, neither the decisions of the Committee nor the ICCPR itself mandate that this Court provide a remedy for Canada's violations. This Court cannot enforce as laws those treaties, no matter how admirable their purposes, which Congress has not chosen to incorporate into our domestic legal system. In the words of the Supreme Court, "where a treaty does not provide a particular remedy, either expressly or implicitly, it is not for the federal [or state] courts to impose one . . . through lawmaking of their own." *Sanchez–Llamas,* —— U.S. at ——, 126 S.Ct. at 2680. Accordingly, Appellant is not entitled to relief on his petition for writ of habeas corpus.

The order of the post-conviction court is affirmed.[18]

Chief Justice CAPPY, Justice CASTILLE, EAKIN and BAER and Justice BALDWIN join the opinion.

18. Pursuant to 42 Pa.C.S. § 9711(i), the Prothonotary of the Supreme Court is directed to transmit the complete record of this matter to the Governor.