J-A31038-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| JOHN SHULER | |
| Appellant | No. 3246 EDA 2014 |

Appeal from the Judgment of Sentence November 6, 2014
in the Court of Common Pleas of Philadelphia County Criminal Division
at No(s): CP-51-CR-0014260-2013

BEFORE: BENDER, P.J.E., MOULTON , J., and FITZGERALD, J.[*]

MEMORANDUM BY FITZGERALD, J.:          **FILED DECEMBER 22, 2017**

Appellant John Shuler appeals from his judgment of sentence of thirty to sixty months' imprisonment followed by four years' probation for robbery,[1] conspiracy to commit robbery,[2] attempted theft by unlawful taking,[3] possession of an instrument of crime,[4] simple assault[5] and filing a false report.[6] Appellant argues that the trial court erred in denying his motion to suppress pants recovered from his car, a BB gun recovered from his house

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 3701(a)(1)(ii).

[2] 18 Pa.C.S. § 903(c).

[3] 18 Pa.C.S. § 901(a).

[4] 18 Pa.C.S. § 907(a).

[5] 18 Pa.C.S. § 2701(a).

[6] 18 Pa.C.S. § 4906(a).

and multiple statements that he gave to a detective at the police station. Appellant also challenges the legality of his sentence. We affirm in part, vacate in part and remand for resentencing.

On August 27, 2013, Appellant was arrested and charged with the foregoing offenses. On June 12, 2014, the trial court held a suppression hearing, entered findings of fact and conclusions of law, and denied Appellant's motion to suppress. N.T., 6/12/14, at 109-115. The trial court held a bench trial and found Appellant guilty of the above-mentioned offenses. The trial court sentenced Appellant to concurrent terms of thirty to sixty months' imprisonment for robbery and conspiracy to commit robbery, a consecutive four years' probation for attempted theft, and four years' probation each for simple assault, false reports, and possessing an instrument of crime, all to run concurrently with his sentence for attempted theft. Appellant filed this timely appeal, and both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issues in this appeal:

> 1. Did not the trial court err in denying [A]ppellant's motion to suppress the pants recovered from his car, the BB gun recovered from his house, and his second and third statements as impermissible fruit of violations under the 4th and 14th Amendments to the United States Constitution and Art. I, Section 8 of the Pennsylvania Constitution because the police:
>
>> (a) unlawfully arrested [A]ppellant without probable cause when they took him from the hospital, without obtaining his consent, and transported him to the East Detective District; and

(b) unlawfully seized [A]ppellant's car without probable cause or reasonable suspicion to believe that the car was evidence or contained evidence of a crime?

2. Did not police unlawfully search [A]ppellant's home in violation of the 4th and 14th Amendments to the United States Constitution and Art. I, Section 8 of the Pennsylvania Constitution because the affidavit of probable cause lacked sufficient probable cause that evidence of a crime would be found inside; and even assuming the affidavit of probable cause was facially sufficient to justify issuance of the warrant, the police intentionally and recklessly omitted the fact that [A]ppellant was licensed to carry a firearm, making the items recovered inside [A]ppellant's home and the third statement unlawfully obtained fruit?

3. Did not the lower court impose an illegal sentence because:

(a) [A]ppellant's sentence for attempted theft under 18 Pa.C.S. § 901[] and 18 Pa.C.S. § 3921, should merge with his conviction for robbery under 18 Pa.C.S. § 3701(a)(1)(ii), and;

(b) [A]ppellant's sentence for simple assault, 18 Pa.C.S. § 2701, should merge with his sentence for robbery under 18 Pa.C.S. § 3701(a)(1)(ii); and even if it did not merge, a sentence of [four] years of probation exceeds the statutory maximum sentence of [two] years as the offense is graded as a misdemeanor of the second degree, and;

(c) [A]ppellant's sentence of [four] years of reporting probation for false reports to law enforcement exceeds the statutory maximum as the offense is graded a misdemeanor of the second degree, 18 Pa.C.S. § 4906?

Appellant's Brief at 3-4.

**APPELLANT'S CHALLENGE TO TRIAL COURT'S SUPPRESSION RULING**

In his first two arguments, which we review together, Appellant challenges the trial court's order denying his motion to suppress the evidence

seized during the warrantless search of his car, his statements to Detective Gonzalez at East Detectives, and the search of his residence. The trial court properly denied Appellant's motion to suppress.

When the defendant files a motion to suppress, "it is the Commonwealth's burden to prove, by a preponderance of the evidence, that the challenged evidence was not obtained in violation of the defendant's rights." *Commonwealth v. Wallace*, 42 A.3d 1040, 1047-48 (Pa. 2012) (citations omitted). In an appeal challenging the denial of a suppression motion,

> [we are] limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of the courts below are subject to [ ] plenary review.

*Commonwealth v. Jones*, 121 A.3d 524, 526–27 (Pa. Super. 2015) (citation omitted). We must only consider the suppression record when reviewing the suppression court's rulings. *See In re L.J.*, 79 A.3d 1073, 1085 (Pa. 2013) ("it is inappropriate to consider trial evidence as a matter of course, because

it is simply not part of the suppression record, absent a finding that such evidence was unavailable during the suppression hearing").

In its Rule 1925 opinion, the trial court summarized the evidence at the suppression hearing as follows:

On August 27, 2013, Detective David Sherwood was alerted that [Appellant] had been shot while allegedly being robbed by two offenders. [On that date], [Appellant] was admitted to Episcopal Hospital with a gunshot wound. [Appellant] was then transferred to Temple Hospital Emergency Room for treatment. Detective Sherwood ordered [Appellant]'s vehicle be towed from Episcopal Hospital to a police garage as a matter of standard procedure. The garage created a property receipt for the vehicle, with a timestamp and description [of] the vehicle indicating "for investigation pending search warrant."

Detective Sherwood interviewed [Appellant] at Temple Hospital, believing [Appellant] to be the victim of a robbery. [Appellant] told the detective he had been fishing near 2400 Bea[ch] Street with a friend when two Hispanic males approached them and one pulled out a gun. [Appellant] said he ran and then heard a gunshot, but it was not until he was nearly home that he realized he was bleeding. [Appellant] told Detective Sherwood he had driven from his home to Episcopal Hospital. Detective Sherwood's interview lasted approximately twenty minutes.

After this initial interview with [Appellant], Detective Sherwood went to Bea[ch] Street and interviewed Cody Laine, who said he was in the area for several hours since the prior evening. He reported that he never heard gunshots, nor saw two men fishing. Around the same time that morning, Detective Samuel Gonzalez began the day shift at East Detectives District, Special Investigations, and Detective Sherwood called to inform him he had found no evidence of a shooting at Bea[ch] Street.

Three hours later,[7] [Appellant] came to East Detectives District for a second interview with Detective Gonzalez. When he arrived, [a police] employee let him into the office. After a conversation lasting five to ten minutes, Detective Gonzalez checked police radio for reports of gunshots in the area of Bea[ch] Street but found none. Considering this information and the report from Detective Sherwood, Detective Gonzalez began to doubt [Appellant]'s story.

Detective Gonzale[z] returned to the interview room, verbally gave [Appellant] *Miranda*[8] [w]arnings, and confronted him with inconsistencies in his story. [Appellant] then alleged he had accidently shot himself at home while taking a black [.380 caliber automatic glock] out of his pants pocket. The detective and [Appellant] walked to the detective's cubicle so that he could type [Appellant]'s statement. Detective Gonzalez read [Appellant] his rights once more, provided a form to acknowledge that he understood them, and then interviewed [Appellant] again. Within an hour of arriving, [Appellant] willingly signed the *Miranda* statement advising him of his rights. [Appellant] told Detective Gonzalez the gun was not registered to him, but that he did have a license to carry. He told [Appellant] the gun was still in his apartment. Detective Gonzalez confirmed [Appellant] had a permit to carry.

Shortly after Detective Gonzalez typed up [Appellant]'s statement and explained that consent to search his vehicle was voluntary, [Appellant] filled out a consent form for the detectives to perform an investigative search of his car. Detective Gonzalez's partner, Detective John Perfidio, proceeded to type up a search warrant to look for the handgun that [Appellant] said he had shot himself with at home on Richmond Street. The search warrant application contained [Appellant]'s first and second versions of the night's events as well as the inconsistent facts discovered by the detectives.

---

[7] Viewed in context, it appears that Appellant was receiving treatment at the hospital during this three-hour period and then accompanied the police to the station following his release from the hospital.

[8] *Miranda v. Arizona*, 384 U.S. 436 (1965).

After obtaining consent, Detective Gonzalez conducted a search of [Appellant]'s car. The detective recovered a pair of black pants with what appeared to be a clean bullet hole, free of burns or residue, in the rear left pocket. The detective then went to [Appellant]'s home, where they found a silver and black 9 millimeter BB gun in the kitchen. In the bathroom where [Appellant] had allegedly shot himself, Detective Gonzalez noted the absence of a [.]380 caliber automatic gun, blood, or any other indication that a shooting had occurred. The BB gun was logged by creating a property receipt.

After conducting the search, both detectives returned to question [Appellant] who had remained at East[] Detectives without handcuffs. The detectives again reviewed [Appellant]'s **Miranda** warnings with him and [Appellant] signed again and gave a third statement. [Appellant] admitted, in his third statement, that he attempted to commit a robbery when he was shot by another male while running away. [Appellant] was subsequently arrested. Police later learned the shooter was the victim of [Appellant]'s robbery.

Trial Ct. Op., 1/30/16, at 2-4.

Additionally, we note that several hours before Appellant arrived at the hospital for treatment of a gunshot wound, two men wearing ski masks attempted to rob a man named Richard Fike near 401 East Girard Avenue in Philadelphia. Police officers brought Fike to Temple Hospital, and Fike looked at Appellant but could not identify him as one of the assailants. N.T., 6/12/14, at 31-33. Later that day, Appellant admitted in his third statement to police detectives that he had attempted to rob another male. The robbery attempted failed, and Appellant was shot as he ran away. Fike was the victim of the attempted robbery and shot Appellant as he fled from the scene.

The trial court held that the police properly impounded Appellant's car, because "the reasonable procedure here was to tow a vehicle when a gunshot victim[] came to the hospital in it." Trial Ct. Op. at 11. The court further held that (1) Appellant was not under arrest when he arrived at the police station, (2) Appellant voluntarily consented to the search of his car, and (3) the search warrant for Appellant's home was supported by probable cause. *Id.* at 11-15.

We hold that the impoundment of Appellant's car was unconstitutional. Nevertheless, the trial court's error was harmless in nature, because the police obtained all other evidence against Appellant through lawful means, and this admissible evidence firmly established his guilt.

We divide our analysis of the suppression issues into the following sections: (1) the impoundment of Appellant's car; (2) Appellant's transportation to East Detectives and first two statements at East Detectives;[9] (3) Appellant's consent to search his car and the ensuing search; (4) the search warrant for Appellant's residence; and (5) Appellant's third statement at East Detectives.

## I.    Impoundment of Appellant's Car

The Commonwealth submitted the following evidence with regard to the impoundment of Appellant's car: at about 4:50 a.m. on August 27, 2013, Appellant drove himself to Episcopal Hospital with a gunshot wound in his left

---

[9] We also refer to East Detectives as the "police station."

buttocks. N.T., 6/12/2014, at 13-24, 28. He lawfully parked his car in the hospital's parking lot and went inside for treatment. *Id.* at 27. Patrol officers at the hospital called police headquarters to notify detectives about the incident, and Detective Sherwood was assigned to investigate the matter. *Id.* at 13-17.

At approximately 5:00 a.m., Detective Sherwood told officers at the hospital to tow Appellant's car. *Id.* at 18-30. At this point, the detective had only been informed that a shooting victim was at Episcopal Hospital; he had not interviewed Appellant, seen the car or learned any other facts about the case. *Id.* At some point later in the morning or early afternoon, the police towed the car to a police garage at Whitaker and McAllister Streets. *Id.* at 46.

Detective Sherwood testified that when police officers report that a shooting victim has arrived at a hospital, the standard police procedure is for police officer to "hold the scene, [and] if there is a car that the victim came to the hospital in, that car is held and we process that car." *Id.* at 17. Detective Gonzalez gave similar testimony, stating that in all shootings in Philadelphia, it is "standard procedure" and "normal practice to confiscate the vehicle that is used to transport a victim from a crime scene to a hospital . . . It is part of the investigation part of the crime scene. And it is what we do." *Id.* at 46-47.

In accordance with this "standard" procedure, Detective Sherwood ordered Appellant's car towed so it "could be examined for any evidence that may have been in the vehicle[.]" *Id.* at 20. Detective Sherwood did not explain why he believed there was any evidence of crime in the car or what evidence or contraband he expected to find. *Id.* at 18, 20-21, 28-30.

The trial court held:

> [T]owing [Appellant's] car was a lawful inventory seizure. Detective Sherwood took custody of the vehicle in anticipation of performing a search. He was also mindful that this would preserve the vehicle for Detective Gonzalez when he took over the case a few hours later. Detective Sherwood had the car towed from Episcopal Hospital and did not search the vehicle. This action involved little invasion of [Appellant's] privacy, since nothing inside the car was actually disturbed and [Appellant] did not have, or need, access to it from Temple Hospital while he was being treated.
>
> The reasonable procedure here was to tow a vehicle when a gunshot victim came to the hospital in it. Both Detectives Sherwood and Gonzalez testified to the established nature of this procedure that might aid in finding a shooter. Detective Gonzalez testified that, in his eighteen years as a detective, he ordered the towing of many cars in similar situations. The procedure was so restrained that it did not even include an inventory search until either a warrant or consent was obtained.

Trial Ct. Op., at 11.

The Commonwealth argues in this Court that the seizure was proper both under the automobile search and inventory exceptions to the Fourth Amendment. Commonwealth's Brief at 15. Appellant contends that neither exception applies. Appellant's Brief at 25-31. We agree with Appellant.

- 10 -

The automobile search exception to the Fourth Amendment requires that police have probable cause to conduct a warrantless search of the vehicle. *See Florida v. White*, 526 U.S. 559, 565-66 (1999). Probable cause to conduct a search exists when the circumstances known to the officer demonstrate a "fair probability that contraband or evidence of a crime will be found in a particular place." *Commonwealth v. Torres*, 764 A.2d 532, 537 (Pa. 2001). Here, Detective Sherwood ordered the car towed at 5:00 a.m. simply because he heard over police radio that a shooting victim was at Episcopal Hospital. He knew nothing more about the incident; nor is there evidence that the officer who made the radio report knew anything more, either. *Compare Commonwealth v. Kenney*, 297 A.2d 794, 796 (Pa. 1972) (in robbery-murder case, upholding warrantless arrest by detective who himself lacked probable cause, where he acted at direction of superior who had specific knowledge of facts and circumstances sufficient to constitute probable cause). While it certainly was proper to investigate the report further, the bare report of a shooting did not, without more, furnish probable cause to believe that police would discover evidence of crime in the car.

Furthermore, there was no valid basis to seize Appellant's car under the inventory exception.

> **The purpose of an inventory search is not to uncover criminal evidence, but to safeguard items taken into police custody in order to benefit both the police and the defendant** . . . In the seminal case of [*South Dakota v.*] *Opperman,* [428 U.S. 364 (1976], the high Court observed that inventory searches of impounded

vehicles serve several purposes, including (1) protection of the owner's property while it remains in police custody; (2) protection of the police against claims or disputes over lost or stolen property; (3) protection of the police from potential danger; and (4) assisting the police in determining whether the vehicle was stolen and then abandoned.

An inventory search of an automobile is permissible when (1) the police have lawfully impounded the vehicle; and (2) the police have acted in accordance with a reasonable, standard policy of routinely securing and inventorying the contents of the impounded vehicle.

**Commonwealth v. Lagenella**, 83 A.3d 94, 102 (Pa. 2013) (emphasis added and citations omitted). "[A]n inventory search is only excepted from the warrant requirement or probable cause where it is motivated by a desire to safeguard the contents of the vehicle and not by a design to uncover incriminating evidence." **Commonwealth v. Germann**, 621 A.2d 589, 594 (Pa. Super. 1993) (citation and footnote omitted).

Inventory searches are permissible in several well-defined circumstances. For example, the legislature has defined instances in which law enforcement officers may impound cars for obstructing roadways or highways. **See** 75 Pa.C.S. § 3352. Moreover, when an individual operates a vehicle on a highway or trafficway while his operating privileges are suspended, law enforcement officers may order the vehicle towed and stored "in the interest of public safety." 75 Pa.C.S. § 6309.2(a)(1). In addition, police departments often promulgate standard procedures for when to tow vehicles. **See Commonwealth v. Chambers**, 920 A.2d 892, 896 & n.3 (Pa. Super. 2007) (police officer properly ordered vehicle towed under his police

department's general order relating to impoundment, which was attached as exhibit to suppression hearing transcript).

These procedures, however, are permissible because they are for a purpose other than gathering evidence. An inventory search cannot be a subterfuge for obtaining evidence of crime. *See Lagenella*, 83 A.3d at 102. In this case, Appellant's car was parked legally in the hospital parking lot and posed no public safety or traffic concerns. The sole reason for impounding Appellant's car was for the purpose of a criminal investigation. Detective Sherwood admitted as much by testifying that the confiscation of Appellant's vehicle was "part of the investigation part of the crime scene." N.T., 6/12/14, at 46-47. The trial court reached the same conclusion in its opinion: "Detective Sherwood took custody of the vehicle in anticipation of performing a search." Trial Ct. Op. at 11. Consequently, the impoundment of Appellant's car was not proper under the inventory search exception. *See Germann*, 621 A.2d at 594.

## II. Appellant's Statement At Hospital And First Two Statements At East Detectives

Following treatment for his gunshot wound, Appellant was transferred from Episcopal Hospital to Temple University Hospital for treatment. There, at 7:00 a.m., Appellant gave the following statement to Detective Sherwood:

> Me and Joe Harris were on our way home from fishing. Two Hispanic males approached and said something to us, but I don't know what they had said. One Hispanic male pulled a gun and we ran. I dropped my gear, and ran home. I believe I heard a gunshot. I was almost home and I felt

- 13 -

> pain in my rear end. I noticed that I was bleeding. Joe and I stepped into my car which was at my house. I drove myself to Episcopal Hospital. And then rescue drove me to Temple Hospital.[10]

*Id.* at 23. Appellant said that he and Harris had been fishing for a couple of hours, and nobody else was fishing around them. *Id.* at 24. Appellant added that the attempted robbery took place in the area of 2400 Beach Street. *Id.* at 37.

Detective Sherwood traveled to the alleged crime scene but found no evidence of a shooting. *Id.* at 40. The detective also obtained a statement from an individual who had been at this location all night long but who had not "hear[d] any commotion, see anybody getting robbed [or] hear any gunshots." *Id.* at 25.

Shortly before 8:00 a.m., Detective Sherwood contacted Detective Gonzalez to inform him of his concerns about the veracity of Appellant's story. *Id.* Detective Sherwood's work shift ended at 8:00 a.m. *Id.* at 29-30.

Between 9:30 a.m. and 10:00 a.m., police officers brought Appellant from the hospital to East Detectives. *Id.* at 48-49 (Detective Gonzalez's testimony that Appellant "was brought" to East Detectives "for re-interview," and "we had his car and said this investigation was not complete"). Nothing in the record suggests that Appellant accompanied the officers to the station involuntarily.

---

[10] Appellant does not contend that this statement should have been suppressed. The trial court found that it was admissible, and so do we.

When Appellant arrived at East Detectives, police officers escorted him to an interview room and told him to wait there for a detective. *Id.* at 48-49, 82. Between 10:00 a.m. and 11:00 a.m., Detective Gonzalez interviewed Appellant without providing *Miranda* warnings, and Appellant repeated his original story. *Id.* at 49-50, 80-82.

Detective Gonzalez left the interview room to review police radio calls but found no reports of gunshots in the area of 2400 Beach Street. *Id.* at 48-50. At around 11:00 a.m., the detective returned to the interview room and read *Miranda* warnings to Appellant. *Id.* at 50-51, 83. Appellant waived his rights and gave a second statement to Detective Gonzalez. *Id.* at 51. Appellant told the detective that he lied about getting shot on Beach Street. *Id.* at 55-56. Appellant said that he and his friend, Joe Harris, were inside Appellant's apartment at 2987 Richmond Street inspecting some of Appellant's air pellet guns. *Id.* at 55. Appellant claimed that when he was using his bathroom, a gun in his back pocket accidentally discharged into his buttocks. *Id.* at 55. Appellant stated that the gun was not registered to him, but he had a valid permit to carry a gun. *Id.* at 57. Appellant left the gun next to his bed, and he and Harris drove to Harris' mother's house on Cumberland Street in order for Harris' mother to examine the wound. *Id.* at 55-57. Appellant told Harris' mother that someone had attempted to rob Harris and him as they left a Sunoco station. *Id.* at 56. This second interview took one to two hours. *Id.* at 60.

The door to the interview room was closed during this time. *Id.* at 87-88. Moreover, individuals cannot leave the station without police permission, and Detective Gonzalez did not offer to escort Appellant out of the station. Detective Gonzalez testified:

> Q. You have to be buzzed out of [E]ast [D]etectives?
>
> A. Yes, you need an ID card.
>
> Q. . . . [I]f you are not a police officer, you would have to be escorted out by officers. Isn't that right?
>
> A. Yes, that is correct.
>
> Q. Okay. You never offered to escort [Appellant] out, did you?
>
> A. No. We were in the middle of an investigation.

*Id.* at 87.

Appellant argues that the police arrested him without probable cause when they transported him to East Detectives, and that his statements at East Detectives were the fruit of an unlawful arrest. The Commonwealth responds that Appellant accompanied police officers voluntarily to East Detectives as an alleged victim of crime, and that his first two interviews at the station did not constitute a custodial detention. We agree with the Commonwealth.

Police detentions become custodial

> when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest.
>
>> The factors a court utilizes to determine, under the totality of the circumstances, whether a detention has

> become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions.

***Commonwealth v. Mannion***, 725 A.2d 196, 200 (Pa. Super. 1999) (*en banc*) (citations omitted).

Here, Appellant was initially interviewed at Temple Hospital by Detective Sherwood and voluntarily gave a statement that he was shot when two individuals attempted to rob him. Approximately two and a half hours later, police officers brought Appellant to East Detectives, but the record does not indicate that he went to the station involuntarily. There is no evidence that he was handcuffed, and the trial court credited Detective Gonzalez's testimony that Appellant was being treated as a victim of crime and not as a suspect. Thus, we agree with the Commonwealth that Appellant was not under arrest at this time.

At the station, Appellant was placed in an interview room and told to wait for a detective, but he only waited for a half hour before Detective Gonzalez arrived to begin the interview. The detective did not give ***Miranda*** warnings (again because he was treating Appellant as a victim, not a suspect), and they spoke for one hour. Appellant repeated his story that two individuals attempted to rob him. Nothing about this first interview constitutes the

functional equivalent of an arrest; it was nothing more than an interview of an alleged victim of crime.

Following the first interview, Detective Gonzalez left the room to perform further investigation. When he returned at 11:00 a.m., he administered *Miranda* warnings, and Appellant agreed to a second interview. He admitted during this interview that he lied about getting shot on the street and now claimed that a gun accidentally discharged in his back pocket while he was inside his apartment. This second statement is admissible because Appellant consented to an interview when the detective administered *Miranda* warnings.

### III.  Appellant's Consent To Search His Car And The Search

Contemporaneous with Appellant's second statement at East Detectives, Detective Gonzalez asked Appellant to consent to a search of his car. N.T., 6/12/14, at 58-59. The detective advised that he was seeking Appellant's "voluntary consent," and that "he didn't have to give it to us." *Id.* at 59. At 12:30 p.m., Appellant signed a form consenting to the search. *Id.* at 59-60.

At 1:55 p.m., the detective recovered a black pair of pants from the car with a bullet hole in the rear left pocket area. *Id.* at 65. In cases of accidental shooting, there are usually burn marks on shooter's clothing. *Id.* at 65-66. There were no burn marks on the pants, indicating that Appellant's claim that he shot himself accidentally was false. *Id.*

The trial court held that Appellant voluntarily consented to the search of his car. We agree, but for different reasons than the trial court. ***See Commonwealth v. Judge***, 916 A.2d 511, 517 n. 11 (Pa. 2007) ("[T]his Court may affirm on any ground"). The trial court held that Appellant was not under arrest when he consented to the search. We, however, assume that Appellant was under arrest, but we still find his consent valid.

"The Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances." ***Commonwealth v. Strickler***, 757 A.2d 884, 901 (Pa. 2000) (citation omitted). Here, Appellant was in custody, and the police informed him that they were in possession of his car. Even so, we do not consider his consent to have resulted from duress, coercion or a will overborne. Appellant was only in custody for a few hours before he gave consent. There is no evidence that his interrogations were improper in any way: the police did not use inappropriate language or tone of voice or make any physical contact with Appellant other than escorting him into an interview room. The totality of circumstances convince us that his consent was voluntary.

## IV. Search Warrant For Appellant's Residence

At some point during the afternoon, Detective Perfidio prepared a search warrant application to seize "ballistics, ammunition, handguns, identification,

[and] any and all items of evidentiary value" in Appellant's apartment residence at 2987 Richmond Street in Philadelphia. N.T., 6/12/14, at 60-61; Commonwealth Exhibit C5. Detective Perfidio stated in his affidavit of probable cause:

> On 8/27/13 at approx. 4:56 a.m., [p]olice responded to Episcopal Hospital where [Appellant] informed them that he was shot by an unknown male at the location of 2400 Beach St. [Appellant] was suffering from a gunshot wound to his left buttock area. Upon investigation, witnesses in the area informed police that there were no gunshots heard in the area at the time of the alleged incident, no crime scene was located at 2400 Beach St. by the assigned. **Upon further investigation inside of [East Detectives, Appellant] stated that the incident occurred inside his residence at the above location, where he accidentally shot himself while removing his .380 handgun from his rear pocket.**
>
> **[Appellant] stated that the weapon is still inside the location.** Your affiant respectfully request[s] a search warrant be approved for the above location to recover the weapon and the above[-]mentioned items.[11]

*Id.* (emphasis added). At 3:55 p.m., a magistrate approved the search warrant. *Id.* Detectives Gonzalez and Perfidio went to Appellant's apartment and recovered a silver and black nine millimeter BB gun in the kitchen area which "look[ed] like a real gun." N.T., 6/12/14, at 67. The detectives did not find a real gun, contrary to Appellant's assurance in his second custodial statement that the weapon was still inside his apartment.

---

[11] The affidavit did not mention the seizure of the pants from Appellant's car, presumably because Detective Perfidio prepared the affidavit before the detectives searched the car.

The trial court held that the search warrant provided probable cause to search Appellant's residence. We agree.

> The legal principles applicable to a review of the sufficiency of probable cause affidavits are well settled. Before an issuing authority may issue a constitutionally valid search warrant, he or she must be furnished with information sufficient to persuade a reasonable person that probable cause exists to conduct a search. The standard for evaluating a search warrant is a 'totality of the circumstances' test as set forth in ***Illinois v. Gates***, 462 U.S. 213 [] (1983), and adopted in ***Commonwealth v. Gray***, [] 503 A.2d 921 ([Pa.] 1985). A magistrate is to make a 'practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' The information offered to establish probable cause must be viewed in a common sense, nontechnical manner. Probable cause is based on a finding of the probability, not a *prima facie* showing of criminal activity, and deference is to be accorded a magistrate's finding of probable cause.

***Commonwealth v. Rapak***, 138 A.3d 666, 670-71 (Pa. Super. 2016) (citation omitted).

Importantly, "[t]he law is clear that where some evidence contained in a search warrant affidavit is unlawfully obtained, we must consider whether the affidavit nonetheless sets forth probable cause in the absence of such evidence." ***Commonwealth v. Hernandez***, 935 A.2d 1275, 1283 (Pa. 2007) (citation omitted).

Detective Perfidio's affidavit of probable cause rests in material part upon Appellant's custodial statement to Detective Gonzalez that he

accidentally shot himself in his apartment. This statement established probable cause that police would find evidence of crime inside Appellant's apartment.

**V.   Appellant's Third Statement At East Detectives**

After searching Appellant's apartment without finding the gun that he said he left there, Detective Gonzalez returned to the police station. At 7:30 p.m., the detective met with Appellant, who had remained in custody throughout the day. N.T., 6/12/14, at 72-73. The detective gave Appellant *Miranda* warnings and "confronted him . . . [with] the inconsistencies in [his earlier] statement. It just didn't add up. And I asked him about [the attempted robbery against Fike]. I asked him, and he told me that he was involved in that [robbery]." *Id.* at 77. Appellant then told the detective that Harris was with him at the time of this robbery. *Id.*

Based on the evidence gathered throughout the day, the police had probable cause to believe that Appellant either had submitted a false report at the hospital or had participated in Fike's robbery. For a second time, the police properly administered *Miranda* warnings, resulting in Appellant's confession that he was involved in the robbery.

**VI.   Conclusion**

As stated above, Appellant claims that the trial court erred by failing to suppress his three statements to police at East Detectives, the evidence obtained during the search of his car, and the evidence obtained during the

search of his residence. Having carefully studied each step of the investigation, we conclude that the impoundment of Appellant's car was unconstitutional. But for the reasons given above, this misstep did not necessitate suppression of Appellant's statements at East Detectives, the evidence obtained during the search of his car, or the evidence obtained from the search of his residence. This admissible evidence, along with the other evidence admitted during trial, provides a sturdy foundation for the verdict. *Cf. Commonwealth v. Iannelli*, 634 A.2d 1120, 1132 (Pa. Super. 1993) (evidence of guilt was so overwhelming that the defendant would have been convicted even absent evidence that police allegedly improperly seized from defendant's residence). The trial court's disposition of Appellant's motion to suppress does not entitle him to relief.

### **Appellant's Challenge To The Legality Of His Sentence**

In his third and final argument, Appellant contends, *inter alia*, that the trial court imposed an illegal sentence of four years' probation for his second degree misdemeanor of false reports, and his sentences for simple assault and attempted theft should merge with his sentence for robbery. The trial court agrees that Appellant's sentence is illegal, Trial Ct. Op., at 16, and the Commonwealth does not oppose a remand for resentencing. Accordingly, we will remand this case for resentencing.

Convictions affirmed. Judgment of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.

P.J.E. Bender joins.

Judge Moulton Concurs in the Result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/22/2017